**NEW YORK MAGAZINE, A DIVISION OF PRIMEDIA MAGAZINES INC., Plaintiff,**

v.

**The METROPOLITAN TRANSIT AUTHORITY and the City of New York, Defendants.**

No. 97 CIV. 8792(SAS).

United States District Court, S.D. New York.

Dec. 1, 1997.

**256**

Marcia B. Paul, Gregory J. Ikonen, William H. Crosby, Jr., Kay Collyer & Boose, New York City, for Plaintiff New York Magazine.

John Low–Beer, Lorna B. Goodman, Yair Goldstein, Office of the Corporation Counsel, New York City, for Defendant New York City.

Jeremy A. Berman, Kenneth Plevan, Skadden Arps, Slate, Meagher & Flom, New York City, for Defendant Metropolitan Transp. Authority.

Arthur Eisenberg, Norman Siegel, Christopher Dunn, New York Civil Liberties Union, New York City, for Amicus Curiae New York Civil Liberties Union.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Who would have dreamed that the Mayor would object to more publicity? But that is what this case is all about. Our twice-elected Mayor, whose name is in every local newspaper on a daily basis, who is featured regularly on the cover of weekly magazines, who chooses to appear in drag on a well-known national TV show, and who many believe is considering a run for higher office, objects to his name appearing on the side of City buses. He staunchly asserts, through his designated officials, that he has a "right to publicity," namely the right to *control* the use of his name when it is used for advertising or trade purposes. However, one who has chosen to be Mayor, and therefore to be the subject of daily commentary and controversy, cannot

avoid the limelight of publicity—good and bad. Because of the "incidental use" and "public importance" limitations on the right to publicity, the Mayor's assertion of his right must yield to the Plaintiff's assertion of its First Amendment right.

By the filing of a Complaint and Order to Show Cause, dated November 25, 1997, Plaintiff New York Magazine, a division of PRIMEDIA Magazines Inc. ("NY Magazine"), seeks a preliminary injunction enjoining and restraining the Metropolitan Transit Authority ("MTA") and the City of New York ("City") from:

> (i) restraining plaintiff PRIMEDIA's fundamental exercise of its right to free speech, guaranteed by the First Amendment to the United States Constitution by refusing to display, or restricting or limiting the display of any of PRIMEDIA's advertisements on city buses pursuant to PRIMEDIA's contract with defendant MTA; or
>
> (ii) tortiously interfering with PRIMEDIA's contract with defendant MTA.

Order to Show Cause, dated November 25, 1997. The basis for this request is summarized in detail below. For sound bite purposes, however, suffice it to say that N.Y. Magazine contracted to display an advertisement ("Ad") on City buses featuring the New York Magazine logo and the following text:

> **Possibly the only good thing in New York Rudy hasn't taken credit for**

After the Ad had begun to run on city buses, New York's Mayor, Rudolph Giuliani ("Mayor," "Rudy" or "Giuliani"), requested Deputy Mayor Randy Mastro to notify the MTA that the Ad should be pulled because it violated his rights under Section 50 of the New York Civil Rights Law ("Section 50").[1] Needless to say, the Ad was immediately pulled. This lawsuit followed.

**1.** Section 50 of the New York Civil Rights Law provides that:

"A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person ... is guilty of a misdemeanor."

Section 51 of the New York Civil Rights Law allows a person to bring a suit to enjoin such use

## I. Factual and Procedural Background

New York Magazine is a weekly magazine, distributed and sold in the New York metropolitan area and elsewhere. The magazine includes news and political commentary regarding New York City, its public officials, public figures and politicians. Complaint at ¶ 4. The Mayor and his aides are covered in the magazine on a regular basis, sometimes in an unfavorable light. *Id.* at ¶ 13. The MTA is a public benefit corporation created in 1965. It owns and operates a majority of the buses that provide local transportation for hundreds of thousands of New Yorkers. *Id.* at ¶ 5. In addition to providing transportation, the MTA solicits advertisements, and contracts for their publication, through an entity known as Transportation Displays Incorporated ("TDI"). On September 11, 1997, TDI, acting on behalf of the MTA, entered into an agreement in which the MTA agreed to run a series of three advertisements by N.Y. Magazine on the sides of 150 City buses.[2] *Id.* at ¶ 9. The Ad in issue was to run on the side of 75 of the buses. *Id.* at ¶ 10. NY Magazine agreed to pay $85,000 for the advertising which was to run from just before Thanksgiving to December 31, 1997, with some possible January 1998 bonus time. *Id.* at ¶ 11.

The full size ads were submitted to TDI and the MTA prior to November 15. *Id.* at ¶ 12. According to an article appearing in The Daily News on Saturday, November 22, 1997, the Mayor asked Deputy Mayor Mastro to call the MTA and ask that the Ad be removed. *Id.* at Ex. A. According to an article in The New York Times, appearing on Sunday, November 23, 1997, the Ad had already appeared on eight buses by the time it was pulled. *Id.* at Ex. B. The article quoted Colleen A. Roche, the Mayor's press secretary, as stating, "[t]he objection was based on

and to seek damages for any injuries sustained as a result of such use.

**2.** The other two ads have the following text:

(1) "Police Brutality, School Reform, and the issue closest to most New Yorkers, how to get a table at Balthazar" and (2) "What people in L.A. read for a little culture and intellectual stimulation." Complaint at ¶ 10.

the use of [Giuliani's] name to promote a commercial product[.]" *Id.*

In support of its request for relief, plaintiff submitted an Affidavit from Beverly Chell ("Chell Aff."), PRIMEDIA's Vice Chairman and General Counsel. This Affidavit annexes the Complaint and the contract between Plaintiff and TDI. *See* Exhibits A and D to Chell Aff. The Terms and Conditions of the "Contract For: Transit Advertising, Bus Shelters, Phone Kiosk" provides that "all advertising copy is subject to approval of TDI and the Transportation Facility concerned as to character, text ...." *Id.* at Exhibit A. Plaintiff also submitted a Memorandum of Law. In response, both the MTA and the City submitted Memoranda of Law, attaching, *inter alia*, the MTA Advertising Standards governing advertising and two advisory opinions of the City of New York's Conflicts of Interest Board. A preliminary injunction hearing was held on November 28, 1997. *See* Transcript of Argument ("Tr."). The hearing consisted of argument from all counsel. In addition, the plaintiff introduced the Ad in issue and the November 10, 1997 issue of New York Magazine, featuring a caricature of Mayor Giuliani on its cover and a cover story entitled "How Far Can Rudy Go?" Tr. at 75–76.

Plaintiff also made a proffer as to certain facts, which solely for the purposes of this application, are deemed to be true. The plaintiff's proffer states that (1) the Ad copy was submitted to TDI during the week of October 17 for pre-approval and was pre-approved, Tr. at 67, 75; (2) the actual physical posters of the Ads were received by the MTA on November[.]10, 1997, Tr. at 67, 75, although not necessarily by a person who exercised any control or authority, Tr. at 83; and (3) the November 10 issue of N.Y. Magazine was on the newsstands as of November 3, 1997 and was mailed to subscribers on that date. Tr. at 76.

By a Board Resolution dated March 25, 1994, the MTA Board adopted certain Advertising Standards. *See* Exhibit A to Defendant MTA's Memorandum of Law. It is unclear whether the 1994 Advertising Standards or a recent 1997 Amendment to those Standards govern this contract. As noted,

the contract was dated September 11, 1997 (although it appears to have been executed by TDI on September 24). *See* Exhibit A to Chell Aff. The parties agree that the 1997 Amendments went into effect after the date of the contract. In any event, the 1994 Standards, as well as the 1997 Amendments, prohibit, *inter alia*, the display of any advertisement that "violates New York Civil Rights Law § 50." *Id.* at § (a)(vii). The 1994 Standards then establish a methodology for reviewing advertisements which requires the MTA advertising contractor (here TDI) to review every ad to determine if it falls within any prohibited category. If it does, the contractor is required to provide the advertiser with a copy of the Standards and notice of the determination, the reasons for it, and to notify the advertiser of its right to request a prompt review. *Id.* at § (c)(i). The MTA concedes that these procedures were not followed in this case. Tr. at 58–59, 63 ("TDI blew it").

Finally, in two Advisory Opinions of the City's Conflicts of Interest Board, attached as Exhibits B and C to the City's Memorandum of Law, the Board opines that a public servant may not "allow his official title to be used to promote [a] book" and may not "promote[] ... the interests of a for-profit entity" even if the public servant donates the compensation for appearing in the advertisement to charity. The City offers these opinions as an additional justification for pulling the Ad. Tr. at 36.

The Complaint states three claims. The first claim, pled against both the City and the MTA, asserts that both entities violated Plaintiff's constitutional right to engage in free speech as guaranteed by the First Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983. The second claim, pled only against the City, asserts that it tortiously interfered with Plaintiff's contract with the MTA. Finally, the third claim, pled only against the MTA, asserts that it breached its contract with Plaintiff and is liable to Plaintiff for any damages it has sustained as a result of the breach. Plaintiff seeks a preliminary injunction based on the violation of its constitution-

al rights and the tortious interference with its contract.

## II. Standard for Determining Whether a Preliminary Injunction is Warranted

 Where a party seeks a preliminary injunction to stay "government action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party must demonstrate irreparable harm and a likelihood of success on the merits. *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996) (quoting *Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995)). A slightly higher standard applies where "the injunction sought 'will alter, rather than maintain, the status quo'—i.e., is properly characterized as a 'mandatory' rather than 'prohibitory' injunction." *Jolly,* 76 F.3d at 473 (quoting *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33–34 (2d Cir.1995)). In such circumstances, the moving party must show a "clear" or "substantial" likelihood of success on the merits. *Id.* The distinction between mandatory and prohibitory injunctions is often elusive, however, and "cannot be drawn simply by reference to whether or not the status quo is to be maintained or upset," particularly where the parties may have different perspectives on what constitutes the status quo. *Id.* at 474 (quoting *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985)).

Plaintiff seeks an order compelling the MTA to display the Ad in issue on 75 city-owned and operated buses. Complaint at ¶ 38. While at one time eight City buses were outfitted with the Ad, *see* Chell Aff. at ¶ 13, the MTA has since removed it from all MTA vehicles. The injunction sought here would therefore alter the status quo by requiring the MTA to outfit its buses with the Ad. Such a mandatory injunction requires that N.Y. Magazine prove a "clear" or "substantial" likelihood of success on the merits.

## III. Section 1983 Constitutional Claim

### A. *Elements of a Section 1983 Claim*

 Section 1983 provides a civil action for the deprivation of constitutional rights under color of law. It provides that:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To state a valid claim under § 1983, "a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Eagleston v. Guido,* 41 F.3d 865, 876 (2d Cir.1994) (quoting *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir. 1993)) (citations omitted). To prevail on a First Amendment claim under Section 1983, Plaintiff must establish that (1) its "conduct is deserving of [F]irst [A]mendment protection" and that the Defendants' conduct "was motivated by or substantially caused by [plaintiff's] exercise of free speech." *Rattner v. Netburn,* 930 F.2d 204, 208 (2d Cir.1991) (quoting *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987)).

### B. *Is a Preliminary Injunction Warranted?*

 As noted earlier, there are two requirements that must be satisfied before a preliminary injunction can be granted. The first requires a plaintiff to demonstrate that absent the requested relief, it will be irreparably harmed. It is beyond cavil that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); *see also Bery v. City of New York,* 97 F.3d 689, 693 (2d Cir.1996). Generally, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable harm is necessary ." 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2948.1 at 161 (2d

ed.1995). Thus, the question presented here is whether Plaintiff can demonstrate a substantial likelihood of success on the merits.

 The state action element of the Section 1983 claim is easily satisfied. The persons who allegedly deprived the Plaintiff of its First Amendment right were the City and the MTA, both governmental actors. Tr. at 4, 21. A governmental entity or subdivision is considered a person under Section 1983. *See Monell v. Dep't of Social Servs. of the City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). The MTA concedes that it decided to pull the Ad based on the Giuliani Administration's interpretation of Section 50. Tr. at 46. As a result, there can be no question that it acted under color of state law. While the City refused to make the same concession, Tr. at 5, it too concedes that its Deputy Mayor acted in reliance on Section 50. Tr. at 35. The more difficult question, then, is whether the speech in issue is entitled to protection under the First Amendment. If it is entitled to protection, the next hurdle is to determine the extent of that protection. I turn then to an analysis of the nature of the "speech" in which Plaintiff seeks to engage.

C. *Is Plaintiff's Speech Protected by the First Amendment?*

 1. *Is the Ad in Issue Commercial Speech?*

 The First Amendment is applicable to the states through the Fourteenth Amendment. *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 1436, 16 L.Ed.2d 484 (1966). It is therefore Plaintiff's Fourteenth Amendment rights that are alleged to have been violated by Defendants' state action. The analysis of the alleged violation remains the same—namely, whether Plaintiff's speech is protected by the First Amendment. Plaintiff claims that its right to convey its message was trampled by state actors for no legitimate reason, much less a substantial or compelling state interest. Plaintiff implies that the reason the Ad was pulled was because the Mayor did not like its content, i.e. the

fact that it pokes fun at him for taking credit for all that is good in New York. Speech is generally protected unless it falls in a category that removes it from the scope of First Amendment protection, including, but not limited to, such categories as speech that infringes copyrights, is libelous, misleading or obscene, or violates a statute or regulation that serves a legitimate public interest. In order to. determine the protection to be afforded to the speech in issue, it is necessary to decide whether it is entitled to full First Amendment protection or to the more limited protection accorded to what is known as "commercial speech."

Once upon a time commercial speech was "deemed wholly outside the purview of the First Amendment." *Penthouse Int'l, Ltd. v. Koch,* 599 F.Supp. 1338, 1344 (S.D.N.Y.1984) (citing *Valentine v. Chrestensen,* 316 U.S. 52, 54, 62 S.Ct. 920, 921, 86 L.Ed. 1262 (1942)). Since 1976, however, the Supreme Court has consistently held that such speech is protected although it "is entitled to a lesser degree of protection than other forms of constitutionally guaranteed expression." *Gordon and Breach Science Publishers S.A. v. American Institute of Physics,* 859 F.Supp. 1521, 1536 (S.D.N.Y.1994) (citing *United States v. Edge Broad. Co,* 509 U.S. 418, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993); *Bd. of Trustees of State University of New York v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). In the seminal case holding that commercial speech is entitled to an intermediate level of protection, the Supreme Court stated that, "[i]f there is a kind of commercial speech that lacks all First Amendment protection, therefore, it must be distinguished by its content. Yet the speech whose content deprives it of protection cannot simply be speech on a commercial subject." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 761–62, 96 S.Ct. 1817, 1825–26, 48 L.Ed.2d 346 (1976).[3] Thus, speech that does no more

---

**3.** Courts have recognized that commercial speech may be prohibited, for example, in the following circumstances: *Pittsburgh Press Co. v.*

*Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 389, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669 (1973) (regulating speech that proposes un-

than propose a commercial transaction is protected by the First Amendment. *Id.* at 762, 96 S.Ct. at 1826.

The question of whether the Ad in issue is commercial or noncommercial speech is not an easy one. The definition of commercial speech embraced by the Supreme Court is "speech that does no more than propose a commercial transaction." *Edge Broadcasting,* 509 U.S. at 426, 113 S.Ct. at 2703. However, in an opinion issued only two months earlier, the Court recognized "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 419, 113 S.Ct. 1505, 1511, 123 L.Ed.2d 99 (1993). As noted in *Gordon and Breach Science Publishers, supra,* the fullest discussion of speech that contains elements of both commercial and noncommercial speech is found in *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). That case involved the commercial solicitation for the sale of condoms. The unsolicited mailings sent by the manufacturer included both price and quantity information but also included informational pamphlets. The Court found that these mailings were a hybrid of commercial solicitation and discussion of public issues. The Court proposed but rejected several bright-line tests to help it resolve the dilemma of categorizing the speech:

> The mere fact that these pamphlets are conceded to be advertisements clearly does not compel the conclusion that they are commercial speech. Similarly, the reference to a specific product does not by itself render the pamphlets commercial speech. Finally, the fact that Youngs has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech.

*Bolger,* 463 U.S. at 66–67, 103 S.Ct. at 2879–80 (citations and footnote omitted). While the Court found the issue to be a close one, it held that "[t]he combination of all these char-acteristics ... provides strong support for the ... conclusion that the informational pamphlets are properly characterized as commercial speech." *Id.* at 67, 103 S.Ct. at 2880. The Court went on to note that:

> The mailings constitute commercial speech notwithstanding the fact that they contain discussions of important public issues such as venereal disease and family planning. We have made clear that advertising which "links a product to a current public debate" is not thereby entitled to the constitutional protection afforded noncommercial speech.

*Id.* at 67–68, 103 S.Ct. at 2880–81 (citation and footnote omitted).

The Ad in issue is clearly a hybrid of commercial speech and political satire. Its central purpose is to advertise N.Y. Magazine and thereby encourage sales. However, the content of the Ad includes political satire—it pokes fun at the Mayor's alleged penchant for taking credit for all of New York's achievements. The question, then, is whether the inclusion of political satire in the motif of the Ad removes it from the category of commercial speech in which it would otherwise clearly fall. In hybrid or ambiguous situations, where there is admittedly no bright-line test, a court must attempt to discern the essence of the speech in order to determine whether the speech is commercial or fully protected. I must look to the combination of all the characteristics to determine the essential nature of the speech. *See Bolger,* 463 U.S. at 67, 103 S.Ct. at 2880. For the following reasons, I conclude that the speech is essentially commercial in nature: (1) it is a paid advertisement; (2) it is not commenting on a current event, in that the Mayoral election was concluded several weeks before the Ad was to run; (3) while the Ad has an element of political satire, its primary purpose is commercial; and (4) N.Y. Magazine has a more appropriate forum, which it uses on a regular basis, to disseminate its views on the Mayor and his quirks.

---

lawful activities); *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (regulating commercial speech to ensure that it is not coercive); and *Virginia State Bd. of Pharmacy,* 425 U.S. at 771–72, 96 S.Ct. at 1830–31 (noting that speech that is false, deceptive or misleading may be regulated). There are many other examples of permissible restrictions on commercial speech.

In *Penthouse v. Koch, supra,* Judge Charles S. Haight of this Court reached a different conclusion with respect to a poster ad that Penthouse contracted to display in subway stations. The poster, advertising its June, 1984 issue, featured a caricature of presidential candidate Walter Mondale by political cartoonist Uri Hofmekler. "The figure, wearing a medallion labeled 'ERA Yes' around his neck, was portrayed as an almost nude male 'stripper', with female hands reaching up toward his unclothed thighs." *Penthouse,* 599 F.Supp. at 1341. In holding that the Penthouse poster involved political speech entitled to full First Amendment protection, Judge Haight concluded that:

> While the driving force behind Penthouse's lease of advertising space in the subway system and its display of the poster at issue was undoubtedly its desire to sell copies of the June issue of Penthouse magazine, the context in which Hofmekler's caricature appears—a paid commercial advertisement—does not deprive it of its political message and content.

*Id.* at 1345. The *Penthouse* case is surely factually similar to this one. Yet, there are certain distinguishing features that permit me to reach a different conclusion here. The most important distinction is that the speech in the Penthouse ad is a comment about a political position Vice–President Mondale was taking in the then current Presidential campaign: to wit, support for the ERA. By contrast, the speech in the Ad in issue is merely a comment on the political style of the Mayor. The Mondale caricature, appearing in any medium, would undoubtedly be viewed as political speech. The N.Y. Magazine Ad, wherever it appeared, would be viewed as promoting N.Y. Magazine. The Penthouse ad is surely protected political speech; the N.Y. Magazine Ad falls in a grey area.[4]

The easiest analysis is to view various advertisements on a continuum from that which is unquestionably political speech to that which is undeniably commercial speech. At the political end of the spectrum is the ad discussed in *Penthouse,* in which the speaker/advertiser chooses to comment on the political position of a candidate in an election year. In the middle is the Ad in issue, in which the speaker/advertiser comments on the political style of a public official. At the opposite end of the spectrum is the hypothetical posed by counsel for the MTA during oral argument. He suggested an ad in which the speaker/advertiser says that the President should eat more of its low-fat foods than the junk food he clearly favors. Tr. at 50. To my mind, this is incontestably commercial speech because it makes no comment whatsoever on any political position or idiosyncrasy of the President's political style. As discussed above, it is the case in the middle, namely the case now before the Court, that is difficult to categorize. On balance, I believe that the Ad in issue fits more comfortably in the category of commercial speech rather than political speech.

### 2. The Standard for Protecting Commercial Speech

■ In *Central Hudson Gas,* 447 U.S. at 566, 100 S.Ct. at 2351, the Supreme Court created a test for determining whether governmental regulation of commercial speech violates the First Amendment.

> At the outset, we must determine whether the expression is protected by the First Amendment. [1] For commercial speech to come within that provision, it at least must concern lawful activity and not be

---

**4.** Other distinctions might include: (1) the fact that the campaign was active at the time the Penthouse ad appeared but that there was no campaign at the time the Ad in issue was to run; (2) the dominant theme of Penthouse magazine is not political debate; thus the political statement was not directly related to the nature of the product being advertised. The opposite is true of the Ad in issue; and (3) the political viewpoint expressed by the Penthouse ad was not inextricably intertwined with the message of that ad. Here, the Ad in issue pokes fun at the Mayor for

his style of claiming credit for all the good things that happen in New York, which is intertwined with the subject of the Ad, namely the political and social commentary for which N.Y. Magazine is known. This point gains support from a statement of Caroline Miller, N.Y. Magazine's editor in chief. "[E]ven though it was an advertisement, it expresses the tone and content of the magazine, which is that we cover the political life of the city with a very strong point of view and, more than occasionally, irreverence." New York Times, November 29, 1997, at B3.

misleading. Next, we ask [2] whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine [3] whether the regulation directly advances the governmental interest asserted, and [4] whether it is not more extensive than is necessary to serve that interest.

This four-part test is still in effect today. *See, e.g., Edge Broadcasting,* 509 U.S. at 424, 113 S.Ct. at 2702. The only serious gloss added to this test was a holding that the fourth element does not require the government to show that it used the "least-restrictive-means" of advancing its interest. Rather, in *Bd. of Trustees v. Fox,* 492 U.S. at 469, 109 S.Ct. at 3029, the Supreme Court held that the regulation must be narrowly tailored to serve a substantial or important state interest.

> What our decision requires is a " 'fit' between the legislature's ends and the means chosen to accomplish those ends,"—a fit that is not necessarily perfect, but reasonable, that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served,"; that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means *narrowly tailored to achieve the desired objective.*

*Id.* at 480, 109 S.Ct. at 3034 (citations omitted) (emphasis added). It is the governmental entity (here the City), that has the "burden of establishing 'a reasonable "fit" between the legislature's ends and the means chosen to accomplish those ends.' " *Discovery Network,* 507 U.S. at 414, 113 S.Ct. at 1508 (citations omitted). A recent summary of the test was written by Judge Pierre Leval:

> If the [commercial] speech passes that test [not misleading and relates to lawful activity], it is nonetheless subject to regulation if the government has a *substantial interest* in regulating the speech, the regulation directly advances that interest, and it is no more intrusive than necessary to accomplish its goal.

*International Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 77 (2d Cir.1996) (citation omitted) (emphasis added) (Leval, J., dissenting).

■ Thus, in the context of this case, the speech here is not misleading and it relates to lawful activity. It is nonetheless subject to regulation if the government has a substantial interest in regulating advertising and this regulation directly advances that interest. If the regulations cited in support of the government action, however, do not apply to this situation, then they cannot support an intrusion into Plaintiff's First Amendment rights.

### D. Is the Exterior of a City Bus a Public Forum, a Designated Public Forum, a Limited Public Forum or a Nonpublic Forum?

Defendants argue that because the exterior of an MTA bus is a nonpublic forum (Tr. at 39) or a limited public forum (Tr. at 41 ), governmental action restricting speech in either of those forums "need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 679, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992). *See also Lebron v. National R.R. Passenger Corp.,* 69 F.3d 650, 655 (2d Cir.1995). If they are right, this standard of review is more permissive than the standard of review accorded to restrictions on commercial speech. It is therefore necessary to decide in what type of forum the Ad in issue appears.

■ For purposes of the First Amendment's Free Speech Clause, the Supreme Court characterizes government property as falling into one of three categories. First, there is the "traditional public forum," which includes public streets and parks, and other "places which 'by long tradition or by government fiat have been devoted to assembly and debate.' " *General Media Communications, Inc. v. Cohen,* 131 F.3d 273, 282 (2d Cir.1997) (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985)). In traditional public forums, content-based regulations of speech are subject to the "highest

scrutiny," and are permissible only if they are "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

 The second category of government property is the "designated" public forum—"a place not traditionally open to assembly and debate," *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3448, but "which the state has opened for use by the public as a place for expressive activity." *Perry,* 460 U.S. at 45, 103 S.Ct. at 954. The designated public forum is subdivided into "limited" and "non-limited" classifications. In a designated public forum whose use is limited to particular purposes or speakers, restrictions on speech within those limits must be reasonable and viewpoint neutral. *General Media,* 131 F.3d at 282 n. 6 (citing, *inter alia, Rosenberger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819, 829, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995)). However, once government "allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." *Travis v. Owego–Apalachin Sch. Dist.,* 927 F.2d 688, 692 (2d Cir.1991). Thus, where the government has not limited the use of a designated public forum to a narrow subject matter, content-based regulations of speech are subject to the same scrutiny as that applied in a traditional public forum ("highest scrutiny"). *See International Soc'y,* 505 U.S. at 678, 112 S.Ct. at 2705. Because the distinction between a limited public forum and a non-limited public forum turns on the degree to which the government intended to make the property available for public use, a court must "examine the policy and practice of the government" to ascertain the property classification. *Lebron,* 69 F.3d at 656 (quoting *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3448) (internal quotes omitted).

 The third property classification is the nonpublic forum, which encompasses all property not included in the other classifications. As stated earlier, restrictions on speech in a non-public forum need only be reasonable. *International Soc'y,* 505 U.S. at 679, 112 S.Ct. at 2705 (citing *Perry,* 460 U.S. at 46, 103 S.Ct. at 955).

 Relying principally on *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) and *Lebron,* Defendants contend that the exterior of city buses are a nonpublic forum I disagree. In deciding that the interior of a city bus was not public forum, the *Lehman* Court relied on the fact that the city had "consciously ... limited access to its transit system advertising space," by prohibiting political advertising in city buses. *Id.* at 303, 94 S.Ct. at 2717. Similarly, in *Lebron,* the Second Circuit held that the large billboard in New York City's Pennsylvania Station was not a public forum because the defendant had "never opened the [billboard] for anything except purely commercial advertising." *Lebron,* 69 F.3d at 656. In the *Lehman* and *Lebron* cases, the government had sufficiently restricted the use of the property at issue to avoid classification as a designated, non-limited public forum.

The property at issue in this case is the exterior of MTA buses. Unlike in *Lehman* or *Lebron,* it is undisputed here that the MTA prohibits neither political nor commercial advertising on the property at issue. Rather, the MTA admits that it permits the genre of speech at issue here, and imposes no restriction on the class of speakers of which Plaintiff is a member. Tr. at 39, 41. By virtue of the MTA's general acceptance of commercial and political advertising, the exterior of an MTA bus is a public forum. *See Hevesi v. Metropolitan Transportation Authority,* 827 F.Supp. 1069, 1071 (S.D.N.Y. 1993) (advertising spaces on New York City buses are designated public forums subject to full First Amendment protections because the MTA displayed a "wide variety of commercial and political messages" as advertising); *Penthouse v. Koch,* 599 F.Supp. at 1346–47 (Transit Authority created designated public forum for advertising of commercial and political speech by acceptance and display of such advertisements over significant period of time).

Thus the standard of review governing restrictions on speech on the exterior of an MTA bus is the same as the standard of

review applicable to speech restrictions in traditional public forums. However, as discussed above, the strict scrutiny review is not applicable here because the Ad in issue involves commercial speech. Accordingly, the MTA's actions are subject to the *Central Hudson* standard of review, rather than to the more permissive review accorded to speech in a limited or nonpublic forum.

### E. *The Exclusion of the Ad*

■ The MTA concedes that the Ad was excluded because its Chairperson agreed with the Deputy Mayor that the Ad violated the terms of Section 50. Tr. at 46. The City also asserts that the Ad was excluded based on a potential conflict of interest. Tr. at 36 ("And I believe there is a public interest that the City of New York has in the use of the Mayor's name for commercial purposes, as the rules of the Conflicts of Interest Board make clear."). The latter argument is easily rejected. Chapter 68 of the City Charter addresses Conflicts of Interest. Sections 2604(b) of the Charter deals with prohibited conduct by a public servant. Specifically, Section 2604(b)(2) states that "[n]o public servant shall engage in any business, transaction or private employment, or have any financial or other private interest, direct or indirect, which is in conflict with the proper discharge of his or her official duties." Section 2604(b)(3) provides that:

No public servant shall use or attempt to use his or her position as a public servant to obtain any financial gain, contract, license, privilege or other private or personal advantage, direct or indirect, for the public servant or any person or firm associated with the public servant.

In a recent advisory opinion the City's Conflicts of Interest Board held that the use of a public servant's name or picture "presents a significant risk that the public servant's official position is being used to advance a private interest. Charter Section 2604(b)(3). Such use under such circumstances would also be in conflict with the proper discharge of the public servant's official duties. Charter Section 2604(b)(2)." Advisory Opinion No. 91-1, Exhibit B to City's Memorandum of Law. However, in

that case the public servant had asked to appear in a print advertisement promoting a for-profit entity. The situation here is entirely different. First, the Mayor has not "used" or "attempted to use his position as a public servant to obtain any financial gain." Second, he has neither engaged in "any business, transaction or private employment" nor does he have "any financial or other private interest" that is in conflict with the discharge of his official duties. It is abundantly clear from the text of the Ad that the Mayor is *not* endorsing the product. Furthermore, the purpose of the Ad not only promotes the interest of the for-profit entity, it also contains humor and satire, both of which enhance the quality of life for all New Yorkers.

I return then to the stated reason for the exclusion—Section 50—which is recognized by the Advertising Standards of the MTA as a basis for excluding an advertisement. If this section applies to the Ad in issue, then the Mayor's right of privacy/publicity must be balanced against Plaintiff's First Amendment rights. If this section does not apply, then neither the MTA nor the City has a substantial interest in removing the Ad. In the absence of such a substantial interest, the Plaintiff's First Amendment right must prevail.

### F. *Does Section 50 Cover the Use of "Rudy" in the Ad in Issue?*

■ Section 50 makes it a misdemeanor to "use[] for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person." Section 51 provides those injured by such conduct with a cause of action for injunctive relief and for damages. It is incontestable that the plain language of the statute appears to make it applicable to the Ad in issue. However, the terms of the statute must be "construed narrowly and not used to curtail the right of free speech, or free press, or to shut off the publication of matters newsworthy or of public interest, or to prevent comment on matters in which the public has an interest or the right to be informed." *Rand v. Hearst Corp.*, 31 A.D.2d 406, 298 N.Y.S.2d 405, 410 (1st Dep't 1969), *aff'd*, 26

N.Y.2d 806, 309 N.Y.S.2d 348, 257 N.E.2d 895 (1970); *see also Groden v. Random House, Inc.,* 61 F.3d 1045, 1051 (2d Cir.1995). Consequently, it is "not sufficient to show merely, as plaintiff does here, that the acts complained of come within the four corners of the words used in the statutes." *Rand,* 298 N.Y.S.2d at 411.

### 1. *The Purpose of the "Right of Publicity"*

 Rather than adhering slavishly to the letter of its text, courts construing Section 50 have looked to the underlying purpose of the statute. *See Groden,* 61 F.3d at 1051 (citing *Rand,* 298 N.Y.S.2d at 410). The primary purpose of the statute is to protect privacy without preventing publication of matters of public interest. *Id.* (citing *Rand,* 298 N.Y.S.2d at 409). This is not, however, the only purpose. Most states now have laws similar to Section 50. Reviewing decisions construing those laws has proved instructive in discerning the purposes underlying these statutes. A recent decision by the Tenth Circuit Court of Appeals provides a detailed discussion of those purposes.

In *Cardtoons v. Major League Baseball Players Ass'n,* 95 F.3d 959, 973–76 (10th Cir.1996), the court compiled numerous justifications for laws providing a right of publicity. Those justifications include: (1) providing an incentive for creativity and achievement; (2) maintaining some value to the commercial use of one's identity by prohibiting commercial exploitation; (3) preventing consumer deception; (4) allowing celebrities to enjoy the fruits of their labors; (5) preventing unjust enrichment; and (6) preventing emotional injuries.

None of these purposes cover the use of the Mayor's name in this Ad. First, as a highly visible public figure Giuliani's interest in his privacy is very limited. One who chooses to be the Mayor of the "Big Apple" must expect that he will be the subject of all kinds of public comments, even in advertisements. My review of scores of right to publicity cases from across the country does not reveal *any* such claims by a high-level public official—nor have the parties cited any. As the court stated in *Wilson v.*

*Brown,* 189 Misc. 79, 73 N.Y.S.2d 587, 589 (Sup.Ct. Kings Co.1947) (rejecting Section 51 claim):

> [O]ne who takes an office, whether it is in government or in outside organizations, must be deemed to have agreed to any reasonable public use of, or reference to, his name .... Persons who accept high positions ought not to be so tender about the mention of their names; they must bear "the white light that beats upon a throne." If they want peace and privacy they should stay out of public life; if they object to having their names legitimately mentioned they need only resign and they will quickly subside into happy obscurity.

The Ad in issue comments on Giuliani's professional persona. As such, it does not invade his privacy. The six justifications in *Cardtoons* are equally inapplicable to the use of the Mayor's name in this Ad. The first, second and fourth, relating to the commercial value of a person's name, cannot apply to the Mayor, who is not permitted to exploit his public office in a commercial venture. The third justification, relating to consumer deception, is inapplicable because the public is correctly informed that the Mayor has not taken credit for N.Y. Magazine's success. The fifth justification does not apply because any benefit to N.Y. Magazine results from the witty political commentary in the Ad, rather than any association between Giuliani and the product. Finally, given the torrent of daily criticism that the Mayor endures, this Ad alone simply cannot cause him emotional distress!

### 2. *The Judicial Exceptions to the Right of Publicity*

The courts have engrafted exceptions and restrictions to Section 50 in order to "avoid any conflict with the free dissemination of thoughts, ideas, newsworthy events, and matters of public interest," guaranteed by the First Amendment. *Time, Inc. v. Hill,* 385 U.S. 374, 382, 87 S.Ct. 534, 539, 17 L.Ed.2d 456 (1967) (quoting *Spahn v. Julian Messner, Inc.,* 18 N.Y.2d 324, 274 N.Y.S.2d 877, 879, 221 N.E.2d 543, 544–45 (1966)). The two principal exceptions are closely related:

the "incidental use" and "public interest" exceptions.

### a. *Incidental Use Exception*

In the particular context of advertisements for books and periodicals, New York courts have recognized an exception for the "incidental" use in ads or other promotional items of materials that "convey the nature and content," *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 131 (2d Cir.1984), or "prove [] the worth and illustrate [] the content" *Groden*, 61 F.3d at 1049 (citing cases), of the works being advertised. For example, the use of a photograph of a professional athlete in an advertisement for a sports magazine has been held not to be actionable under Section 50, as the photo was deemed to be merely incidental to the advertisement's larger purpose of selling magazines. *Namath v. Sports Illustrated*, 48 A.D.2d 487, 371 N.Y.S.2d 10, 11–12 (1st Dep't 1975), *aff'd*, 39 N.Y.2d 897, 386 N.Y.S.2d 397, 352 N.E.2d 584 (1976). While many New York cases applying the "incidental use" exception involve the republication of items originally used in the underlying publication, republication is not required. *See Groden*, 61 F.3d at 1049. Furthermore, even where the advertisement does not conform precisely to the content of the underlying publication, the "incidental use" exception is applicable. *See, e.g., Velez v. VV Publ'g Corp.*, 135 A.D.2d 47, 524 N.Y.S.2d 186, 189 (1st Dep't 1988) (rejecting Section 50 claim where picture of plaintiff in magazine was used in subsequent advertisement which added cartoon bubble containing text to photo of plaintiff). ·

A recent New York case considered the scope of the incidental use exception in circumstances similar to those presented here. *See Stern v. Delphi Internet Serv. Corp.*, 165 Misc.2d 21, 626 N.Y.S.2d 694 (Sup.Ct.N.Y.Co. 1995). That case addressed the use of talk show host Howard Stern's photograph in a magazine advertisement by an on-line service dedicated to the issue of Stern's candidacy for governor of New York. The court held that use of Stern's photograph constituted incidental use, because the Stern candidacy

was "well within the range of subjects which courts have deemed to be of public interest, namely electoral politics," and because the advertisement "use[d] plaintiff's name and photograph to indicate the subject on the computer bulletin board." *Id.*, 626 N.Y.S.2d at 700.[5]

### b. *Public Interest/Newsworthy Exception*

The public interest exception to Section 50 is closely related to the incidental use exception. Courts have applied the public interest exception to permit the use of photographs of persons without their consent where the photographs relate to a magazine, newspaper article or film concerning newsworthy events or subjects of public interest, including political events, social trends, scientific news, and stories of consumer interest. *See, e.g., Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993) (rejecting Section 51 claim where photo of a patient at a psychiatric hospital was printed in newspaper story concerning another patient at same hospital); *Murray v. New York Magazine Co.*, 27 N.Y.2d 406, 318 N.Y.S.2d 474, 267 N.E.2d 256 (1971) (rejecting Section 51 claim where photo of plaintiff at St. Patrick's Day Parade was published on cover of magazine containing article on Irish immigrants).

In contending that the public interest exception is inapplicable in this case, Defendants rely on *Beverley v. Choices Women's Med. Ctr., Inc.*, 78 N.Y.2d 745, 579 N.Y.S.2d 637, 587 N.E.2d 275 (1991), in which a medical facility distributed a calendar promoting the facility, entitled "Women—Choosing to Make a Difference." The calendar depicted people and events in the history of the women's movement, including one photograph of the recipient of an award for achievement in women's medicine and the plaintiff, a doctor who was not affiliated with the medical facility but was identified by name. The court sustained the plaintiff's Section 51 claim, holding that the public interest exception did not apply, despite the fact that the calendar focused on the women's movement. "[A]

---

**5.** At least one court has indicated that the incidental use exception is inapplicable where an advertisement "conveys or reasonably suggests the subject's endorsement of the publication in question." *See Velez*, 524 N.Y.S.2d at 189. This limitation is inapplicable here because no reasonable reader could believe that Giuliani had endorsed N.Y. Magazine, given that the Ad pokes fun at him and the text of the Ad says that "Rudy" does *not* take credit for the product's success.

commercial advertiser such as [the defendant] may not unilaterally neutralize or override the long-standing and significant statutory privacy protection by wrapping its advertising message in the cloak of public interest, however commendable the educational and informational value." *Id.,* 579 N.Y.S.2d at 641, 587 N.E.2d at 278.

*Beverley,* however, is distinguishable from the case at bar. In evaluating the applicability of the public interest exception to the facts of the case, the *Beverley* court noted that the defendant is "not a media enterprise; its calendar was an advertisement of its only business—providing medical services." *Id.* at 640, 587 N.E.2d at 277. In contrast, the present case concerns advertisements for a publication of political commentary, the subject matter of which is deserving of the highest of constitutional protection. Moreover, N.Y. Magazine does not assert, as did the defendant in *Beverley,* that all uses of names or photographs in its advertisement are excluded from the reach of Section 50 because the advertisement serves some public interest. Rather, it is the very use of Giuliani's name here that makes the statement newsworthy.[6] The defendant in *Beverley* could issue a calendar addressing the women's movement without mentioning the plaintiff. The Ad at issue, however, could not mock the Mayor's eagerness to take credit for all the City's successes without mentioning him.[7] Unlike in *Beverley,* therefore, the public interest element of the Ad in issue is *inseparable* from the use of the Plaintiff's name.

### c. The Incidental Use and Public Interest Exceptions Applied

As an example of the relationship between the incidental and public interest exceptions, consider the following. The November 10, 1997 issue of N.Y. Magazine contained an article that discussed the possibility that Giuliani might one day campaign for President and speculated as to how he might perform as President. The article was illustrated with various caricatures of Giuliani dressed as George Washington. The dominant image on the magazine's cover is a caricature of Giuliani dressed as Washington, which was accompanied by large, bold text: "HOW FAR CAN RUDY GO?". Though the magazine cover is designed to attract customers and sell magazines, the caricature and use of Giuliani's name certainly did not violate Section 50. *See Murray,* 318 N.Y.S.2d at 476, 267 N.E.2d 256. By the same token, because its use of the Mayor's name falls within the public interest exception, if N.Y. Magazine were to reprint the caricature for an advertisement. to be displayed on the sides of MTA buses, the caricature would clearly fall within the incidental use exception, given the subject matter of the article. Both exceptions therefore rely on the relationship between the use of Giuliani's name and the matters of public importance discussed in the magazine.

The incidental use and public interest exceptions similarly exclude the Ad in issue from the reach of Section 50. New York City politics in general, and Giuliani in particular, are regular subjects of N.Y. Magazine articles, which are often written in a light-hearted and witty style. Even the very subject matter of the Ad's text—Giuliani's alleged penchant for claiming credit for New York's successes—has been a subject of N.Y. Magazine articles. Indeed, the November 10, 1997 article on Giuliani and the presidency mentions this subject: "The police, many of whom feel *Rudy takes way too much credit* for crime reduction, grumble about how the mayor gave himself a raise while they got none." Mark Jacobson, *Rudy's Oval Office Dream,* New York Magazine, Nov. 10, 1997, at 53 (emphasis added). The article's conclusion further refers to Giuliani as a man with "a sense of his own grandeur." *Id.* City politics always engenders newsworthy issues—and the Ad in issue informs the public that N.Y. Magazine addresses those issues.

---

**6.** The advertisement was to be posted on MTA buses beginning just before Thanksgiving. Complaint at ¶ 11. Thus the advertisement was to circulate less than three weeks after the Mayoral campaign in which Giuliani's credit-seeking had been an issue.

**7.** It should be noted that satire or a parody of a public figure is of no lesser public interest than other political discourse. *See generally Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *Cardtoons,* 95 F.3d at 969.

Though the Ad as a whole is commercial speech, the advertisement undeniably includes an element of political commentary. It would be anomalous indeed to permit a reprint of a caricature of Giuliani that had appeared in the magazine, but prohibit the Ad at issue which includes speech of public interest.[8]

### 3. Summary

Given the notoriety and position of the person asserting the right of publicity and the content of the Ad in issue—which combines incidental use, public interest, and political satire—I conclude that Section 50 simply does not apply to this Ad.

### G. Balance of Public Interests

The Court of Appeals has recently stated that:

> [w]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief.

*Time Warner Cable of New York City v. Bloomberg L.P.,* 118 F.3d 917, 929 (2d Cir. 1997). Balancing such interests here is not difficult. In a certain sense, none of the parties has stated a compelling claim that its position affects a matter of great importance to the public. However, the underlying legal interests asserted by each of the parties are important. Plaintiff relies on the First Amendment and asks that such rights be carefully guarded. Defendants rely on their obligation to enforce their Advertising Standards, which incorporate Section 50. A public entity has a public interest in upholding the law. However, because Section 50 does not protect the use of the Mayor's name in the context of the Ad in issue, Defendants are unable to establish that they are acting in the public interest.

**8.** The MTA argues that if Plaintiff had used the term "Mayor" rather than "Rudy," this would still violate Section 50. Tr. at 51 (citing *Onassis v. Christian Dior–New York, Inc.,* 122 Misc.2d 603, 472 N.Y.S.2d 254 (Sup.Ct.N.Y.Co.1984)).

### H. A Preliminary Injunction is Warranted

For the reasons set forth above, Plaintiff has shown both irreparable harm and a substantial likelihood of success on the merits of its claim for preliminary injunctive relief on its Section 1983 claim that Defendants have violated its First Amendment right to display the Ad in issue.

## IV. Tortious Interference with Contract

### A. Elements of the Claim

In order to prevail on a claim for tortious interference with contract under New York law, a plaintiff must prove: (a) the existence of a valid contract between plaintiff and another party; (b) defendant's knowledge of the existence of that contract; (c) defendant's intentional procuring or inducing, without legal justification or excuse, of a breach of that contract by the other party; and (d) resulting injury to plaintiff. *Int'l Minerals and Resources, Inc., v. Pappas,* 761 F.Supp. 1068, 1074–75 (S.D.N.Y.1991), *aff'd in relevant part,* 96 F.3d 586 (2d Cir.1996); *Sharma v. Skaarup Ship Management Corp.,* 699 F.Supp. 440, 446 (S.D.N.Y.1990); *Artwear, Inc. v. Hughes,* 202 A.D.2d 76, 615 N.Y.S.2d 689, 694 (1st Dep't 1994) (citing *Israel v. Wood Dolson Co.,* 1 N.Y.S.2d 116, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97, 99–100 (1956)); *S & S Hotel Ventures Ltd. Partnership v. 777 S.H. Corp.,* 108 A.D.2d 351, 489 N.Y.S.2d 478, 480 (1st Dep't 1985). Plaintiff must demonstrate that the interference with its contractual relations was "intentional, not merely negligent or incidental to some other, lawful, purpose ..." *Alvord & Swift v. Stewart M. Muller Constr. Co.,* 46 N.Y.2d 276, 413 N.Y.S.2d 309, 312, 385 N.E.2d 1238, 1241 (1978) (citations omitted); *Costanza Constr. Corp. v. City of Rochester, Inc.,* 135 A.D.2d 1111, 523 N.Y.S.2d 707, 708 (4th Dep't 1987).

### B. Likelihood of Success on the Merits

Plaintiff has not shown a likelihood of success on the merits of this claim. First, as a

This creates another odd result, allowing N.Y. Magazine to create an advertisement satirizing the Board of Education or the Family Court, but not the Mayor or the District Attorney.

technical matter, the contract at issue is between N.Y. Magazine and TDI, not between Plaintiff and the MTA. While TDI is retained as the MTA's advertising contractor, the Complaint is defective in pleading that N.Y. Magazine had a contract with the MTA. Of greater importance, is the notion of intentional interference. There is no doubt that the Ad was pulled because the Mayor advised his Deputy to alert the MTA to his view that the Ad violated his rights under Section 50. In that sense, it was the City's action, through the Mayor's representative, that caused TDI to default on its contract with N.Y. Magazine. However, the MTA (and the City) is required to enforce the Advertising Standards adopted by its Board. Once the City alerted the MTA to the Section 50 claim, the MTA was obliged to pull the Ad if it agreed that the Ad violated Section 50.

The City is not responsible for the MTA's decision to pull the Ad. Both the City and the MTA had the right to be wrong without being liable for intentionally interfering with a contract. Whether Section 50 covers this Ad, as discussed at length above, is a close question. It was perfectly reasonable for the City and the MTA to believe that it did. Indeed, no less an authority than the editorial page of the New York Times opined that, "The Mayor may have been technically within his rights, thanks to a state law protecting people from having their names or faces used in advertisements without their permission." *New York Times*, November 25, 1997 at 24. It appears that the City acted with justification and incident to a lawful purpose, namely upholding Section 50.

To determine whether interference with a contract may be justified, the New York Court of Appeals has adopted the formulation of the Restatement (Second) of Torts § 766 (1979). *See Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 189, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980). That section states, in pertinent part that:

> One who intentionally and *improperly* interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contact.

*Id.* (emphasis added). Section 767 of the Restatement then lists several factors to be considered in determining whether an intentional interference is improper.

> The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation.

*Id.* at 190, 428 N.Y.S.2d 628, 406 N.E.2d 445. In *Jews for Jesus, Inc. v. Jewish Community Relations Council, Inc.*, 968 F.2d 286, 292 (2d Cir.1992), the court acknowledged the test adopted by the Court of Appeals and set forth the factors that must be balanced.

> These factors include: the nature of the defendant's conduct, the defendant's motive, the interests of the plaintiff with which the defendant interferes, the interests the defendant seeks to advance, the social interests at stake, the proximity of the defendant's conduct to the interference, and the relations between the parties.

Considering all of these factors, Plaintiff has not shown a likelihood of success on its claim that the City intentionally ("improperly") interfered with Plaintiff's contract with TDI.

## V. Conclusion

Plaintiff has shown that it is entitled to preliminary injunctive relief on its § 1983 claim that Defendants have violated its First Amendment rights. Accordingly, Defendants are enjoined and restrained from refusing to display, or restricting or limiting the display of PRIMEDIA's advertisements on city buses pursuant to its September, 1997 contract with TDI. The Ad in issue should be reinstated forthwith.

SO ORDERED: