Patricia D. CORNWELL, Plaintiff,

v.

Leslie Raymond SACHS, individually
and trading as Pussycat Press,
Defendants.

No. CIV A 3:00CV229.

United States District Court,
E.D. Virginia,
Richmond Division.

May 18, 2000.

Conrad M. Shumadine, Gary A. Bryant, Michael C. Davis, Willcox & Savage, P.C., Norfolk, VA, for Plaintiff.

Thomas H. Roberts, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

Patricia Cornwell, a world renowned author of crime novels, filed this action against local author Leslie Raymond Sachs, asserting claims of defamation and violations of the Lanham Act, 15 U.S.C. § 1125(a) and Virginia's privacy statute, Va.Code Ann. § 8.01–40. Cornwell simultaneously moved for a preliminary injunction to restrain Sachs from the unauthorized use of her name and from issuing false and misleading advertising by making statements asserting that a novel published in 1998 by Sachs was the basis for Cornwell's yet-to-be-published novel, *The Last Precinct.* For the reasons which follow, the Motion for Preliminary Injunction is granted.

## FINDINGS OF FACT

The facts found in correspondence between Sachs and agents of Cornwell, the depositions; and the testimony of Sachs and Cornwell at the hearing, reveal two dominant themes. The first is Sachs' endeavor to fabricate a scandal alleging that Cornwell copied the ideas contained in Sachs' 1998 novel *The Virginia Ghost Murders* as the basis of her own, forthcoming novel to be entitled *The Last Precinct.* The second theme, closely related to the first, is Sachs' announced intention to use the fabricated scandal and Cornwell's name in his efforts to market his own novel.

### Sachs' Novel And His Original Contact With Cornwell's Agents

In 1998, Sachs published *The Virginia Ghost Murders,* a mystery novel of which approximately 1,650 copies are currently in circulation and approximately 350 of which are in Sachs' possession available for circulation. The back cover of Sachs' novel, as originally published, informs the reader that the plot concerns a modern-day sleuth who, in solving a contemporary crime, becomes involved in solving a murder dating from the era of the Civil War.

In the December 6, 1999 edition of *Publisher's Weekly,* the book publisher Penguin Putnam issued a promotion for *The Last Precinct,* Cornwell's soon-to-be-published novel.[1] After noting the author's name and the book title, the advertisement text read: "Dr. Kay Scarpetta's probe into a four-hundred-year-old murder puts a contemporary killer on her trail in a thrilling face-off against crime both ancient and high-tech." Although Cornwell maintains a website, that site reveals no details about the plot of *The Last Precinct.*[2]

After seeing the advertisement for *The Last Precinct* in *Publisher's Weekly,* Sachs wrote a series of increasingly harassing letters to agents of Cornwell in which he suggested that Cornwell had taken his ideas and used them in the writing of her yet-to-be-published novel. The first of these letters, dated December 10, 1999, was directed to Alexander Gigante, corporate counsel for Penguin Putnam Inc., Cornwell's publisher. The full text of the letter reads:

> The inside cover of this week's PW has your ad for my neighbor Patricia Cornwell's new book upcoming in July '00, and not only is it on the same theme as my much-loved novel *The Virginia Ghost Murders,* the ad copy phrasing echoes my back cover!

How very interesting!

Hr'g Ex. 2. The December 10 letter marks the initiation of Sachs' attempt to concoct a scandal involving Cornwell.

On December 16, 1999 Gigante responded with a letter to Sachs stating:

> In reply to your December 10, 1999 letter, I can only judge the theme of your book, *The Virginia Ghost Murders,* by the Amazon on-line review. Based on that source, I do not see any similarity whatsoever with [the] above forthcoming Patricia Cornwell work. In any event, as an experienced author you should know that no one can copyright or control a theme.
>
> Regarding the ad copy in the December 6, 1999 edition of Publisher's Weekly for the Cornwell book, as you did not provide the jacket copy for you novel, I have no way of knowing what you mean when you state that the former "echoes" the latter. However, the Cornwell ad is just a one-sentence summary of her forthcoming book's story. It is hard to see how that Cornwell-specific copy could "echo" anything else.
>
> In short, the law does not support your overly generous view of your proprietary rights.

Hr'g Ex. 3.

### Sachs' Unrequited Letters Of Increasing Harassment

Shortly thereafter, on December 21, 1999, Sachs again sent a letter to Gigante, a copy of which Sachs also sent to Cornwell's literary agent Esther Newberg. *See* Hr'g Ex. 4. The letter begins by thanking Gigante for "supplying [Sachs] with such hilarious marketing material" for the promotion of *The Virginia Ghost Murders,* and thus marks the first indication of Sachs' intention to capitalize on the scandal he was beginning to fashion. In his

---

**1.** At the time, publication was anticipated to be in July 2000, but the release date is now November 2000.

**2.** There also is a description of Cornwell's book on a website for Amazon.com. *See* Def.'s Proffer of Evidence. It allegedly was placed there in March 2000 but neither Cornwell nor Sachs had seen it before this action began.

December 21 letter, Sachs characterizes the December 16, 1999 letter from Gigante (excerpted above in full) as displaying Gigante's "hostility and litigious mindset." Again, basing his accusations on nothing other than Gigante's December 16 letter, Sachs accuses Gigante of "badgering [Sachs] with legal baloney when it's you who are duplicating my stuff, not the other way around!," and, further, of "just get[ting] hostile out of the blue and ... winging legal crap at me." In the same letter, Sachs leaves no uncertainty as to his intentions, warning Gigante that "all the weird stuff you might do in hostility to me is fodder I can use in the marketing of my book." And, Sachs queried Gigante: "[D]o you mind if I quote this patently goofy and false statement of yours? It will be greatly useful in marketing my book this spring! Having a major publishing executive like yourself being so totally full of malarkey is a competitive marketer's dream." Indeed, Sachs could not have been more clear about his strategy: "My plan for the New Year is to have a large-scale web and media marketing campaign springing from the obvious similarities between Patsy's book and mine." Again, Cornwell's book had yet to be written, and, by his own testimony, the only details of which Sachs had knowledge were contained in the one-line advertisement of less than thirty words that had appeared in *Publishers Weekly* on December 6, 1999.

Not having received a response to his letter of December 21, 1999, Sachs wrote another letter to Gigante on January 5, 2000. *See* Hr'g Ex. 5. In it, Sachs purports to "confirm" that Gigante has no intention of commenting on what Sachs perceived as similarities between the novels, while Sachs' accusations of illicit copying grow more pointed and insistent:

> [M]y focus is on the literary question of Ms. Cornwell using my book as a source, model, and inspiration to the degree that

she adopted my own major plotline for her own upcoming bestseller. Because of the imitation of my book in hers, I have a right to a certain literary recognition for my role in connection with one of 2000's biggest upcoming blockbusters. I am flattered that Ms. Cornwell appears to have made use of my plot and storyline, and if there is anything I would request in exchange for her borrowing it would be some assistance in helping my own work gain a wider audience.

Also on January 5, 2000, Sachs wrote to Esther Newberg, Cornwell's agent at International Creative Management. *See* Hr'g Ex. 6. Sachs offered Newberg a chance to deny the similarities between his book and Cornwell's, warning Newberg that he would soon be contacting the media to report his version of the relationship between the books.

Over one month after Gigante's letter of December 16, 1999—the first and only response that Sachs had by then received from Cornwell or her agents—Sachs wrote to David Wan, newly installed president of Cornwell's publisher, The Penguin Group. *See* Hr'g Ex. 7. Sachs' January 19, 2000 letter begins: "I just want to be sure that you personally are up to date regarding the issues of Patricia Cornwell copying the plot of my previously published 1998 novel, in order to create her new book ...." Sachs then added detail to the scandal he was fabricating by suggesting that Cornwell had been given a copy of Sachs' *The Virginia Ghost Murders* by a mutual acquaintance of Sachs and Cornwell.[3] Sachs confessed to being "flattered that Patsy found my book worth of imitation," and again underscored his intention to manufacture publicity for *The Virginia Ghost Murders*:

> My plans for this spring, assuming continuing stonewalling by Penguin, are to mount an *aggressive publicity campaign*

---

**3.** The evidence presented at the hearing failed to establish that Cornwell ever saw a copy of Sachs' novel. And, the record is now clear that Sachs' acquaintance never sent a copy of *The Virginia Ghost Murders* to Cornwell or anyone else.

*piggy-backing on your publicity for Patsy, via traditional media and the web.* Hr'g Ex. 7 (emphasis added). Searching for fodder to feed his burgeoning, fanciful "scandal," Sachs invited Wan to comment "on Patsy's copying of my book," and suggested that he would be "very pleased to pass along [Wan's] words." Read as a whole, Sachs' January 19, 2000 letter leaves the impression that Sachs was intending to make good on his threats to launch a media campaign based upon his allegations of copying.

On January 24, 2000, still not having received any response since Gigante's letter of December 16, 2000, Sachs wrote a "MEMORANDUM" to Wan, Gigante, Esther Newberg (Cornwell's literary agent), and Phyllis Grann (also of Penguin Putnam). *See* Hr'g Ex. 8. The memorandum reads:

> In a few weeks I will be doing another reprint of THE VIRGINIA GHOST MURDERS to meet demand, and with Ms. Cornwell's mimicking of my plot for her upcoming book it seems the best and equitable thing is to just put her name right at the top of the cover of my book. I enclose a copy of the new cover mechanical, and also of the new inside pages no. iv and v which have content naming Ms. Cornwell.
>
> You may indicate your acceptance of my new book cover and inside copy by continuing your stonewalling and silence about Ms. Cornwell's imitation of the plot of my book. Thanks for your valuable time.

As indicated, Sachs attached a copy of what he represented to be the new cover for a reprint of *The Virginia Ghost Murders.* At the top of the proposed cover, in a font size which dwarfs the font used for Sachs' own name, is printed the following text: "The MUST–READ gothic mystery that preceded PATRICIA CORNWELL'S newest bestseller!" Hr'g Ex. 10. Also attached to the memorandum are two pages that Sachs said were to be included in the reprint, the text of which alludes to the similarity between the two novels as well as the fact that Sachs was flattered by Cornwell's imitation of his work. *See* Hr'g Ex. 9.

**Cornwell's Agents Respond With Letters Two, Three and Four**

Cornwell's attorney, Michael Rudell, responded immediately with a letter to Sachs, dated January 24, 2000. *See* Hr'g Ex. 11. Sachs refused receipt of the letter, see Hr'g Ex. 14, but acknowledged receiving a faxed copy on February 1, 2000. Rudell's letter denied that Cornwell had ever read or heard of Sachs' novel, recognized that Sachs was claiming Cornwell had copied his work, and requested that Sachs cease making untrue and defamatory statements. Most importantly, Rudell's letter emphasized that Sachs "h[ad] no right or authorization to use the name of Ms. Cornwell or any of her literary works or any of her representatives in or in connection with the promotion or publicity of your works or any of your other activities." Finally, Rudell's letter warned Sachs that Cornwell would "take all steps necessary to protect her rights ...." Rudell's letter of January 24, 2000 was the second letter Sachs received from Cornwell or any of her agents or representatives.

The third such letter, also responsive to Sachs' January 24 "memorandum," was written by Gigante and dated January 28, 2000. In the letter, Gigante reaffirmed that Sachs did not have consent to refer to Cornwell or Penguin Putnam Inc. on his book cover, and advised that Cornwell "will take appropriate legal action" against Sachs if he attempted to trade on Cornwell's name. *See* Hr'g Ex. 12.

The fourth and final letter written to Sachs by Cornwell's agents is dated February 1, 2000. In it, Cornwell's attorney Rudell acknowledged Sachs' letter to David Wan, denied that Cornwell had plagiarized Sachs, and demanded that Sachs: (1) cease and desist from defaming Cornwell; (2) withdraw his false state-

ments; and (3) "destroy all copies of the book and advertising relating to your book that imply such illicit copying occurred." Hr'g Ex. 13. The letter also warned that, unless Rudell received Sachs' written confirmation by no later than February 10, 2000 stating that Sachs would comply with these demands, Rudell would "take such steps as we deem appropriate to protect Ms. Cornwell's literary rights."

### Sachs Escalates His Letter–Writing Campaign To Fabricate A Scandal

Having finally provoked responses from Cornwell's agents, Sachs escalated his efforts to draw attention ·to his own work through a series of increasingly malicious letters. In a February 1, 2000 letter to Rudell, a copy of which was faxed to Newberg, Sachs casts himself in the role of David against Cornwell's Goliath by characterizing the four letters from Cornwell's .agents as "Cornwell's attempt to misuse her wealth and power to intimidate and silence a small local book author like me . . . ." Hr'g Ex. 17. The malicious tone of the letter is visible in Sachs' gratuitous reference to Cornwell as "America's most famous lesbian." Referring to Rudell's February 1, 2000 reasonable demand that Sachs "withdraw and destroy all copies of the book and advertising related to your book that imply such illicit copying occurred," see Hr'g Ex. 13, Sachs called Cornwell a "book-burning nazi" engaged in "mafia-style stonewalling." Again, the factual predicate of Sachs' accusations is entirely contained within the four letters from Cornwell's agents, discussed, *supra.* Indeed, Sachs was himself aware that he could have satisfied Rudell's request by simply removing any reference to Cornwell's name from his books and ceasing to use her name in connection with the marketing of his book. Instead, Sachs fabricated from whole cloth the accusation that Cornwell and her agents threatened the physical destruction of his books by fire; clearly, Sachs thought that such a threat sounded more scandalous than Rudell's actual, far more reasonable demand.

The characterization of Cornwell as a "book-burning nazi" is a theme which Sachs repeats in further missives, including a February 1 facsimile to Cornwell's agent Newberg, see Hr'g Ex. 18; a February 3 facsimile to Gigante, see Hr'g Ex. 19; a February 17 facsimile cover sheet and press release sent to Michael Greenstein, President of Avon Books, see Hr'g Ex. 20; a February 6 letter to Rudell, see Compl. Ex. 16; and a press release reporting the "scandal" (discussed *infra*), the scope of circulation of which is undetermined, see Hr'g Ex. 21. For instance, the letter to Gigante opened with the statement: "As with your other lawyer who threatened me, take your threats and shove them up your criminal nazi bookburning ass." Hr'g Ex. 19. The February 6 letter to Rudell, meanwhile, claims that Cornwell has been exposed as "a nasty, dirty and ruthless book-burning Nazi." Compl. Ex. 16. In the same letter, Sachs relates that through "[n]otes of heartwarming support from around the country . . . [p]eople are telling me they will consider a boycott of Penguin Putnam books, and that they will never again buy or read a book by Patricia Cornwell."

At the hearing, Sachs denied that his letters meant what they said and attempted to explain his venomous, and factually baseless, letters to Cornwell's agents as a form of "satirical needling" designed to elicit a response to his suggestion that Cornwell had copied his work. Having assessed the documentary evidence and evaluated Sachs' testimony, the lack of logic in it, and his evasive demeanor while testifying, the Court rejects as untrue Sachs' testimony about his purposes. Indeed, Sachs' trial testimony makes it quite clear that his purpose was to fabricate a "scandal" to use in advertising his own failed book, *The Virginia Ghost Murders.*

### Sachs Goes Online With His Accusations And Publicity Stunt

Having fabricated the so-called scandal, Sachs then set out to use it to sell his own book. Thus, on or about February 3,

Sachs, acting through "Pussycat Press," published a piece on his website (www.vag-host.com), which includes a variety of false and defamatory statements. The website contains the heading "The Patricia Cornwell scandal: The Last Precinct & The Virginia Ghost Murders," and promises visitors a "sneak peek" at Cornwell's upcoming novel. The website, authored by Sachs himself, characterizes the series of letters he sent to Cornwell's agents as "gentle inquiries," and characterizes Cornwell's responses as "strange and bizarre threats." After a series of quotations lauding *The Virginia Ghost Murders,* the website included a section entitled "FOR IMMEDIATE RELEASE TO THE MEDIA." Among the accusations in the press release are that Cornwell:

- "wants to burn a local author's books and extort his silence."

- "has taken the extremist and outrageous steps of threatening and menacing a local Virginia author whose work she fears may be competitive with her own."

- "appears to be very embarrassed about the fact that the public may soon learn that her upcoming July 2000 book, The Last Precinct, has the same plot line as" Sachs' novel.

- "has exploded with hatred, hiring New York lawyers to threaten and menace [Sachs] with massive financial ruin and the burning and destruction of his books unless he agrees to keep silent about the similarities."

- "threatened to use her wealth and power to destroy small-press author Sachs if he does not agree to keep silent about the book similarities so embarrassing to Cornwell."

- "has sunk to the ugly level of misusing her riches for intimidation of free speech and nazi-style bookburning."

- is involved in a "conspiracy" to "crush and destroy a lone small writer and to burn his books."

Compl. Ex. 19. The website no longer contains that iteration of the press release, but still references the "fuss associated with the celebrity mystery writer Patricia Cornwell" and Cornwell's "threat to burn our books . . . ." Hr'g Ex. 28.

In addition to the website, Sachs admitted to having posted the essential text of the "press release" on the newsgroup at rec.arts.mystery. He also sent a hard copy version of it to Rudell. A recent newsgroup posting is reproduced as Hearing Exhibit 26, and contains Sachs' version of his correspondence with Cornwell's agents. At the hearing, Sachs admitted to having posted a copy of the "press release," and further admitted that publication of the "press release" likely damaged Cornwell's reputation. In reference to that posting, Sachs testified to having received approximately twenty follow-up responses.

**The Sticker**

In addition to his letter-writing and internet campaign, in mid-March, Sachs produced a sticker which reads "The book that famous PATRICIA CORNWELL threatened to destroy." Sachs affixed the sticker to approximately 350 of the 2000 copies of *The Virginia Ghost Murders* currently in circulation. When asked at the hearing, Sachs asserted rights protected by the First Amendment, refused to remove the sticker, and indicated plans for future stickers detailing the ongoing litigation. In response to the question whether Sachs believed the sticker would help sales of his book, Sachs responded "maybe," but claimed he used the sticker to protect himself from Cornwell's outrageous threats.

**The Civil Action**

On April 11, 2000, Cornwell filed both a Complaint and a Motion for Preliminary Injunction in the federal district court. The Complaint charges Sachs with (I) libel; (II) use of Cornwell's name without consent for advertising/trade purposes, in violation of Virginia Code § 8.01–40; and (III) false statements in an attempt to market his book, in violation of the federal Lanham Act, 15 U.S.C. § 1125(a). The

Motion for Preliminary Injunction urges the Court to restrain Sachs from (1) using Cornwell's name, or any description designed to identify Cornwell, for advertising and/or promotional purposes including, but not limited to, the purpose of advertising/promoting *The Virginia Ghost Murders* or any other publication, and (2) making false statements intended to deceive the public in attempts to advertise and/or promote *The Virginia Ghost Murders.*

## CONCLUSIONS OF LAW

Cornwell presents three claims in her complaint. Count I is a claim for libel *per se.* Count II is a claim under Virginia's privacy statute, Va.Code Ann. § 8.01–40. Count III is a Lanham Act claim. The preliminary injunction is requested to enjoin the asserted violations of law presented in Count II and Count III.

### I. Statutory Authorization For Injunctive Relief

■ Virginia Code § 8.01–40, prohibiting the unauthorized use of a person's name for advertising purposes without first having obtained the written consent of such person, provides that an aggrieved party "may maintain a suit in equity against the person ... to prevent and restrain the use thereof ...." The standard calculus for assessing preliminary injunctions is applied to a request for injunctive relief sought under Virginia Code § 8.01–40. *See Friends of Phil Gramm v. Americans for Phil Gramm in '84,* 587 F.Supp. 769, 771 (E.D.Va.1984).

■ Similarly, the Lanham Act authorizes injunctions against the use of false and misleading advertising. In order to secure injunctive relief under Section 43(a) of the Lanham Act, a plaintiff must demonstrate "that an advertisement is either literally false or that the advertisement, though literally true, is likely to mislead and confuse consumers," and that the plaintiff will suffer irreparable harm absent the injunction. *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d

1544, 1548–49 (2d Cir.1991). A request for preliminary injunctive relief under the Lanham Act also is subject to the standard which applies to requests for preliminary injunctive relief generally, as outlined in part II, *infra. See, e.g., The Citrus Group, Inc. v. Cadbury Beverages, Inc.,* 781 F.Supp. 386, 388 (D.Md.1991) (applying *Blackwelder* and *Rum Creek* standards to assess propriety of injunctive relief sought under Lanham Act).

### II. The Standard For Assessing The Motion For Preliminary Injunction

■ The grant of interim injunctive relief is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in limited circumstances' which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 811 (4th Cir.1991) (citation omitted). In this circuit, the decision whether to exercise this power is controlled by the hardship balancing test, which involves the application of four factors:

(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,

(2) the likelihood of harm to the defendant if the requested relief is granted,

(3) the likelihood that the plaintiff will succeed on the merits, and

(4) the public interest.

*Id.* at 812 (citations omitted). It is the plaintiff's responsibility to establish that each of the four factors warrants the exercise of the extraordinary power of injunction. First, the plaintiff must make a "clear showing of irreparable harm as a condition for the grant of a preliminary injunction," and, the irreparable harm "must be 'neither remote nor speculative, but actual and imminent.'" *Id.* (citations omitted). Unless the plaintiff proves irreparable injury, the analysis never proceeds further.

■ Under the balancing of hardships tests, the second step is to consider the likelihood of harm to the defendant from the grant of injunctive relief and then to balance the likelihood of irreparable harm to the plaintiff from failing to grant such relief against the likelihood of harm to the defendant if it is granted. *Id.* The third step involves the consideration of success on the merits. In that regard:

> If, after balancing those two factors [*i.e.,* irreparable harm to plaintiff against the harm to the defendant], the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.' As the balance tips away from the plaintiff, a stronger showing on the merits is required.

(*Id.* at 812–13 (citations omitted)). In other words, if the balance of harm strongly favors the plaintiff, it is not required that the plaintiff make a strong showing of likelihood of success on the merits. This is because the hardship balancing test is a "sliding scale" approach and "the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction." *Id.* at 813 (citations omitted).[4]

Before undertaking an analysis of the nature, seriousness and immediacy of the harm, it is appropriate to recall that "[w]here the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Systems, Inc. v. InterDigital Communications Corp.,* 17 F.3d 691, 694 (4th Cir.1994). "Even if a loss can be compensated by

money damages at judgment, however, extraordinary circumstances may give rise to the irreparable harm required for a preliminary injunction." *Id.* For example, if the moving party's business could not survive absent a preliminary injunction or if damage would not be obtainable because the defendant may become insolvent before final judgment can be entered, the requirement of irreparable injury may be satisfied. Of course, "[t]hese situations are quite narrow, reflecting instances where the harm suffered by the plaintiff from denying the injunction is especially high in comparison to the harm suffered by the defendant from granting it." *Id.*

■ Before turning to the facts of this case, it is necessary to recognize the distinction between preliminary prohibitive injunctive relief and preliminary mandatory injunctive relief. The "courts have made a distinction in treatment between a motion for preliminary injunctive relief to maintain the status quo and one to provide mandatory relief, especially relief which in effect operates as deciding the case in favor of the movant." *Tiffany v. Forbes Custom Boats, Inc.,* 1992 WL 67358, at *6 (4th Cir. Apr. 6, 1992) (per curiam). The distinction between the two types of preliminary injunctive relief is set forth in *Wetzel v. Edwards,* 635 F.2d 283, 286 (4th Cir.1980), where the Court of Appeals explained:

> The authority of the district court judge to issue a preliminary injunction, especially a mandatory one should be sparingly exercised. Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief.

---

4. Therefore, the party seeking an injunction can satisfy the burden by showing a combination of *probable* success and the *possibility* of irreparable injury or by showing that serious legal questions are raised on the merits and that the balance of hardships is decidedly in

his favor. However, the judge ought to require " 'a fairly clear cut probability of success if he did not find that the harm to the plaintiff outweighed harm to the defendant *to a significant degree.*' " *Id.* (citations omitted).

Because the court's view in *Wetzel* "conforms to the views of other circuits," the Fourth Circuit frequently finds guidance in decisions by other circuits in articulating the standard for a mandatory preliminary injunction. *Tiffany*, 1992 WL 67358 at *6. For instance, in *Tiffany*, the Fourth Circuit cited the Second Circuit with approval to the effect that:

> Where, as here, mandatory relief is sought, as distinguished from maintenance of the status quo, a strong showing of irreparable injury must be made, since relief changing the status quo is not favored unless the facts and law clearly support the moving party.

*See id.* (citing *Doe v. New York Univ.* 666 F.2d 761, 773 (2d Cir.1981)). Additionally, the court in *Tiffany* cited with approval a decision of the Tenth Circuit, wherein that court observed that:

> [T]he following types of preliminary injunctions are disfavored and they require that the movant satisfy an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction may be issued: (1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits.

*Tiffany*, 1992 WL 67358 at *6 (citing *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir.1991)); *see also Citizens Concerned for the Separation of Church and State v. City and County of Denver*, 628 F.2d 1289, 1299 (10th Cir.1980), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981) (requiring a showing of compelling circumstances to justify the imposition of preliminary injunctive relief that was mandatory and which disturbed the status quo); *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1979) (noting that because a preliminary injunction that alters the status quo is "particu-

larly disfavored" the movant must make a strong showing of entitlement).

Accordingly, our Court of Appeals held in *Tiffany* that "in cases where the request for preliminary relief encompasses both an injunction to maintain the status quo and to provide mandatory relief, as here, *the two requests must be reviewed separately, with the request for mandatory relief being subjected to a more exacting standard of review.*" *Tiffany*, 1992 WL 67358 at *7 (emphasis added). On the facts, as developed in discovery and at the preliminary injunction hearing, Cornwell asks for both prohibitive and mandatory preliminary relief.

■ Each test involves the same components; however, the analysis is different because the likelihood of success that must be shown for a mandatory preliminary injunction is the existence of a clear and convincing probability of success. *See Tiffany*, 1992 WL 67358 at *6. Thus, "if there is doubt as to the probability of plaintiff's ultimate success," a request for preliminary mandatory relief "must be denied." *Id.*

### III. Application Of The *Direx Israel, Ltd.* Standard For Granting Preliminary Relief

■ Cornwell seeks a preliminary injunction to enjoin Sachs from: (1) using her name, or any description intended to identify her, for advertising and/or promotional purposes; and (2) making false statements intended to deceive the public in attempts to advertise and/or promote *The Virginia Ghost Murders*. On this record, the requested relief would include enjoining Sachs from putting the advertising stickers on the copies of his book when they are sold by him; requiring Sachs to inform booksellers who now hold books to which the sticker has been affixed that the stickers must be removed or obliterated; requiring Sachs to amend his internet website; and enjoining him from future

violations of the statutes on the website, as well as in other advertising media.

## A. Cornwell Would Be Likely To Suffer Irreparable Harm If The Preliminary Injunction Is Denied

Under *Direx Israel*, the first step in assessing a motion for preliminary injunction is to ascertain the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied. Here, the potential for irreparable harm to Cornwell is great indeed.

The record here demonstrates that Sachs used a press release, his website (Hr'g Ex.'s 21 & 22), and the sticker he placed on *The Virginia Ghost Murders* (Hr'g Ex. 27) to advertise and promote his book. Those documents contain false and misleading descriptions and representations of fact.

The version of the website that was in effect until mid-March 2000 included:

### The Patricia Cornwell scandal: The Last Precinct & The Virginia Ghost Murders

- Would you like a sneak peek at the new July 2000 book by multi-millionaire world-famous mega-author Patricia Cornwell, the book entitled "The Last Precinct"? Then you might take a look at "The Virginia Ghost Murders", a hit small press gothic mystery novel published in Patsy Cornwell's home state of Virginia two years earlier.
- When Leslie Sachs, the author of "The Virginia Ghost Murders", made some gentle inquiries about the similarity of Cornwell's book to his book, Cornwell at first was stonewalling and evasive for almost two months, and then exploded with hatred.
- Cornwell hired New York lawyers to menace author Sachs with financial ruin and the burning and destruction of copies of "The Virginia Ghost Murders" unless he agreed to keep quiet! Why is Patsy Cornwell acting so strange and making such weird threats? Is she feeling guilty about something?
- See the full text of the press release about the Patricia Cornwell scandal below.

Hr'g Ex. 22.

The heading was false because there was no scandal involving Cornwell. Sachs simply concocted a scandal to sell his book. The first textual statement was false and misleading because nothing at all supported the assertion that a reading of Sachs' book would give a "sneak preview" of Cornwell's work in progress.

The second textual statement was false and misleading because the undisputed record is that Cornwell did not stonewall or act evasively. Indeed, on December 16, 1999, six days after Sachs first raised the issue with Cornwell's publisher, the publisher responded to Sachs, telling him that there was no similarity and no copying of his ad. *Compare* Hr'g Ex.'s 3 and 4. The statement is also false and misleading because Cornwell did not explode, with hatred or otherwise. Like the supposed "scandal," the explosion was fabricated by Sachs—again to sell his book.

The third textual statement is false and misleading because no one menaced Sachs with financial ruin and no one threatened to burn or destroy his books unless he "agreed to keep quiet." Sachs was simply told to "withdraw and destroy all copies of the book and advertising relating to [it] that imply such illicit copying [by Cornwell] occurred." Hr'g Ex. 13.

The fourth textual statement refers the reader to a press release, Preliminary Hearing Exhibit 21. It contains the following false and misleading descriptions or representations of fact.

The Patricia Cornwell scandal

Millionaire mega-author makes sleazy nazi-type threats She wants to burn a local author's books and extort his silence

- Scandal has begun to swirl around world-famous multimillionaire mega-author Patricia Corn-well, who has taken the extremist and outrageous step of threatening and menacing a local Virginia author whose work she fears may be competitive with her own.

- Patricia Cornwell appears to be very embarrassed about the fact that the public may soon learn that her upcoming July 2000 book, *The Last Precinct,* has the same plotline as a successful small-press mystery novel, **THE VIRGINIA GHOST MURDERS.**

- After two months of stonewalling and evasion regarding the similarity, Patricia Cornwell has now exploded with malice, hiring New York lawyers to threaten and menace **VIRGINIA GHOST MURDERS** author Leslie Raymond Sachs with unspecified harms and the burning and destruction of his books unless he agrees to keep silent about the similarities.

- The repeated response for nearly two months was mafia-style stonewalling, and there was no denial by Patsy's agent or publisher that Cornwell had in fact used **THE VIRGINIA GHOST MURDERS** as her inspiration.

- Cornwell changed her stance from stonewalling to one of aggressive threat and intimidation. Cornwell threatened to use her wealth and power to destroy small-press author Sachs if he does not agree to keep silent about the book similarities so embarrassing to Cornwell.

- Apparently the calculation was made to risk the reputation of Putnam and Cornwell in a game of ruthless intimidation, in order to try to preserve the massive profits of the Cornwell "franchise".

- Her attempt to extort silence, and her book-destruction threat, make her a disgrace to American authors. Cornwell appears to be drunk on her wealth and power and political connections, now that she has sunk to the ugly level of misusing her riches for intimidation of free speech and nazi-style bookburning.

- This threat by a major publishing conglomerate in conspiracy with millionaire mega-author Cornwell, to crush and destroy a lone small press writer and to burn his books, is a nasty episode that contains a frightful message about the misuse of economic might to destroy free speech and undermine the First Amendment.

Hr'g Ex. 21. As shown in the Findings of Fact, every one of those statements is false and misleading.

The sticker placed on the book is "The book that famous author PATRICIA CORNWELL threatened to destroy!" As explained in the Findings of Fact, Cornwell never threatened to destroy Sachs' book. Thus, it too is false and misleading.

The record shows that these false and misleading statements are likely to cause confusion among the people who are potential buyers of Cornwell's book. Indeed, Sachs himself asserted that "[p]eople are telling [him] they will consider a boycott of Penguin Putnam books, and that they will never again buy or read a book by Patricia Cornwell." Compl. Ex. 16. If Sachs is to be taken at his word, then irreparable injury will result—indeed, already has resulted—from his concocted scandal. The injury to Cornwell will take the form of the destruction of her reputation as an author, and could cost her large sums in book sales. Sachs himself claimed in his threatening correspondence to Cornwell's agents that the lost sales "could total in the millions." Compl. Ex. 16. Of course, conceptually, the lost sales are remediable by an award of money damages, but the loss

of reputation likely could not be remedied absent injunctive relief.

Sachs asserts that Cornwell is unable to show irreparable injury because lost sales are compensable by money damages. However, as Cornwell explains, "[t]he monetary damage from such false and deceptive advertising is absolutely impossible to determine as Ms. Cornwell cannot tell how many readers have been exposed to Sachs' false and deceptive statements, how many were actually influenced by the statements, and how many made purchasing decisions as a result of the statements." Cornwell Mem. at 21. This, of course, is correct. Sachs, however, asserts that, because Cornwell has admitted that the extent of her damages would be "absolutely impossible to determine," she cannot demonstrate irreparable harm.

■ That argument turns the law on its head because the law in this Circuit is just to the contrary. It is because damages are incalculable and not susceptible of proof that irreparable injury is shown. *See, e.g., Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 551 (4th Cir.1994) ("irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate"); *Phillips v. Crown Central Petroleum Corp.,* 602 F.2d 616, 629 (4th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1021, 62 L.Ed.2d 756 (1980) ("a future injury of uncertain date and incalculable magnitude is irreparable harm, and protection from such an injury is a legitimate end of injunctive relief").

Moreover, Sachs is judgment proof. He has told the court that he could not even afford to hire counsel. And, under *Hughes Network Systems, Inc. v. InterDigital Communications Corp.,* 17 F.3d 691 (4th Cir.1994), the inability to collect on a damage award can constitute irreparable injury. What Cornwell has shown clearly is that her reputation will suffer definite harm if Sachs is permitted to continue his publicity campaign by "piggy-backing" on Cornwell's name. For example, Cornwell has testified as follows:

> The people I have to concern myself with are the ones who don't know me because they can form a judgment, which may stay in their minds forever about who and what they think I am.
>
> \* .\* \* \* \* .\*
>
> My character and my name mean more to me than anything and I just—it's other people I don't know. How do they know it isn't true?

Cornwell Depo. at 64–65 (Cornwell Reply Ex. 3). Cornwell testified that Sachs' statements could affect sales of her books: "there is a lot of people that will form impressions that will never buy [my] book if they decide you are the sort of character or person that they don't approve of, who is unfair or unjust or inhuman . . . ." *Id.* at 177. Cornwell accurately summarized another aspect of her showing of irreparable injury by testifying that "Leslie Sachs has slandered my reputation both as a writer and as a human being, and my name is everything to me." *Id.* at 40.

As required of a movant seeking preliminary relief, Cornwell has made a "clear showing of [the] irreparable harm" that she would be likely to suffer absent the preliminary injunction she requests. *See Direx Israel,* 952 F.2d at 812. Because Sachs has already engaged in activity which harms Cornwell's reputation, Cornwell has also demonstrated that the irreparable harm is "neither remote nor speculative, but actual and imminent." *See id.* (citing *Dan River, Inc. v. Icahn,* 701 F.2d 278, 284 (4th Cir.1983)). Indeed, according to Sachs, readers of his false, misleading vitriol are threatening to boycott Cornwell's books. And, in Sachs' own words, the "scandal," as he is fond of calling his fabricated marketing scheme, will result in turning Cornwell's "public image into a smelly excretion and the losses to her and Putnam [the publisher] could total in the millions." Compl. Ex. 16. Of course, Sachs' statement is in error because it was he who created the scandal, but he was not

amiss in describing the probable effect of his creation on Cornwell's reputation.

On this record, Cornwell has proved irreparable injury on the result of Sachs' false and misleading statements. Indeed, Sachs has falsely accused Cornwell of plagiarism, perhaps the most serious professional indictment that can be made against an author. And, he has accused her of extortion, a felony. He has described her conduct as nazi-like bookburning and he has charged that Cornwell threatened to destroy his book, a serious accusation by an author against another author. None of Sachs' accusations are true; they are misleading and, if believed, they reasonably could be expected to have the very effect Sachs himself has forecast.

However, Sachs contends that here is no risk of injury because in mid-March he changed his website to a more moderately-worded indictment of Cornwell. *See* Hr'g Ex. 28. The assertion of moderation is only half true. A more accurate statement is that Sachs' accusation of plagiarism and improper conduct have been tempered. But, tempered or not, the statements about Cornwell are false and misleading and they are still part of Sachs' self-confessed marketing program for his own book. Hence, the harm from the website continues.

Moreover, Sachs has a press release which he has issued in hard-copy, see Compl. Ex. 16 & Hr'g Ex. 21, and which he has posted on an internet newsgroup. Thus, the press release continues to circulate. And, so too do the untrue stickers on the books in the hands of the booksellers.[5]

### B. Sachs Would Not Be Likely To Suffer Irreparable Harm If The Preliminary Injunction Is Granted

Under the balancing of hardships inquiry, the second step is to determine the likelihood of harm to the defendant from the grant of injunctive relief and then to balance the likelihood of irreparable harm to the plaintiff from failing to grant such relief against the likelihood of harm to the defendant if it is granted.

The only harm Sachs complains of is that, if the injunctive relief sought by Cornwell is granted, he would suffer an abridgement of his right to free speech, which is protected under the First Amendment. Of course, Sachs' appeal to the First Amendment is illusory because he seeks to protect speech activity which is not protected by the First Amendment. The Lanham Act's prohibition of false and misleading advertising does not arouse concerns under the free speech clause of the First Amendment. *See Vidal Sassoon, Inc. v. Bristol–Myers Co.,* 661 F.2d 272 (2d Cir.1981); *see also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema,* 604 F.2d 200 (2d Cir.1979) (same). Indeed, an injunction that restrains only false or misleading commercial speech "is consistent with the First Amendment." *In re Corey,* 892 F.2d 829, 839 (9th Cir.1989), *cert. denied,* 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990). "Nothing is clearer in the emerging law of commercial free speech than that false or misleading commercial speech is clearly subject to restraint." *U–Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1042 (9th Cir.1986) (citing to *Bates v. State Bar,* 433 U.S. 350, 383, 97 S.Ct. 2691, 53 L.Ed.2d 810, *reh'g denied,* 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977); *Encyclopedia Britannica, Inc. v. Federal Trade Commission,* 605 F.2d 964, 972 (7th Cir.1979), *cert. denied,* 445 U.S. 934, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980)). "Commercial speech that is false when uttered does not enjoy the protection of the First Amendment." *Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 949 (3rd Cir.1993). "False statements of fact harm both the subject of the falsehood

---

**5.** Sachs testified that only a few of his books bearing the sticker are presently in the hands of booksellers. However, there are about 350 books in his hands which will bear stickers when sold.

and the readers of the statement. [The state] may rightly employ its libel laws to discourage the deception of its citizens. There is 'no constitutional value in false statements of fact.'" *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (citations omitted). In short, the First Amendment of the United States Constitution does not protect Sachs from liability for telling lies for the purpose of the advertising and promotion of his book. And, that is true equally for his utterly unauthorized use of Cornwell's name as well. *See* Section C, 2, *infra.*

On this record, Cornwell has shown a present and serious prospect of irreparable harm absent an injunction. That is especially true because, as Sachs admitted at the hearing, he is poised to continue his poisonous marketing campaign if not enjoined. And, Sachs has shown no likelihood of any harm to him whatsoever. Thus, the balance of hardships "'tips decidedly' in favor of the plaintiff." *Direx Israel*, 952 F.2d at 813 (citing *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991)).

## C. Cornwell Is Likely To Succeed On The Merits

Because the balance of hardships clearly favors Cornwell, "a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.'" *Id.* at 812–13 (citations omitted). Moreover, "[a]s the balance tips away from the plaintiff, a stronger showing on the merits is required." *Id.* Because here the balance tips strongly in favor of Cornwell, it would not usually require that she make a strong showing of likelihood of success on the merits. *See id.* at 813. However, because part of the injunctive relief sought is mandatory in nature, she must make a clear and convincing demonstration that she ultimately will succeed. Cornwell has met

that burden by showing that she is virtually certain of success on the merits of her claim that Sachs violated the Lanham Act and Virginia Code 8.01–40.

## 1. The Lanham Act Claim (Count III)

The Lanham Act provides, in pertinent part, that:

> Any person who, *on or in connection with any goods or services,* or any container for goods, *uses in commerce any* ... name ... false or misleading description of fact, or false or misleading representation of fact, which -
>
> (A) is *likely to cause confusion,* or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (emphasis added). Injunctive relief under Section 43(a) of the Lanham Act is available to a plaintiff demonstrating "that an advertisement is either literally false or that the advertisement, though literally true, is likely to mislead and confuse consumers," and that the plaintiff will suffer irreparable harm absent the injunction. *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir.1991).

In a document entitled "FOR IMMEDIATE RELEASE TO THE PRESS," attributed to Sachs' Pussycat Press, Sachs makes claims which are either false or likely to mislead and confuse consumers. *See* Compl. Ex. 18. For instance, Sachs writes that Cornwell "has taken the extremist and outrageous steps of threaten-

ing and menacing a local Virginia author whose work she fears may be competitive with her own;" of course, Sachs has no way of knowing what Cornwell "fears." Moreover, the passage implies that Cornwell was the aggressor, when the facts reveal that Cornwell, through counsel, was merely responding to repeated harassments from Sachs.

The press release continues, stating that *The Last Precinct* "has the same plotline as a successful small-press mystery novel, *The Virginia Ghost Murders.*" Since *The Last Precinct* has not even been published, Sachs cannot know its plotline; moreover, Cornwell has testified that she has never even seen a copy of *The Virginia Ghost Murders,* much less read it or imitated it, which fact makes her borrowing of its plot extremely implausible. The press release is false and misleading. The press release refers to Cornwell's "attempt to extort silence," which is a completely false and misleading description of the events as reflected in the correspondence between Sachs and Cornwell's agents. Read as a whole, the press release leaves the impression that Cornwell was coming after Sachs in an attempt to silence a perceived threat. Read as a whole, the actual correspondence between Sachs and Cornwell—upon which the allegations in the press release are based—paints a drastically different picture. Statements similar to those in the press release are made on Sachs' website at www.vaghost.com. (In fact, the press release appears to have been incorporated into the website at one time, see Compl. Ex. 19, but no longer appears there.) On the website, Sachs published that he merely made "gentle, constructive, and non-threatening" inquiries (false and misleading) and that the responses from Cornwell were "extremist" (false and misleading); "threatening and menacing" (misleading); "sleazy threats" (misleading); "mafia-style stonewalling" (misleading); "aggressive threat and intimidation" (misleading); "threatened to use her wealth and power to destroy" Sachs (false and misleading); "attempt to extort silence

from Sachs and the threat to burn his books" (patently false); "ruthless intimidation" (misleading); "malicious and perverted threats" (false); "perhaps America's most famous lesbian" (misleading, malicious, gratuitous, vile, and strikingly irrelevant); "sunk to the ugly level of misusing her riches for intimidation of free speech and nazi-style bookburning" (false and misleading); "conspiracy" (false); "crush and destroy a lone small press writer" (misleading). In fact, however, according to Cornwell, the only letters Sachs *ever* received from representatives of Cornwell were the January 24, 2000 and February 1, 2000 letters from Cornwell's counsel, Michael Rudell. *See* Cornwell Reply at 14. We now turn to the substance of those letters to measure whether Sachs' published claims are false or misleading.

The January 24, 2000 letter responds to several letters sent by Sachs to various persons connected with Cornwell; one of Sachs' letters implied that silence would be deemed an approval of Sachs' intended usage of Cornwell's name. The January 24 letter from Rudell merely (1) denies any improper copying or imitation of Sachs' book; (2) demands that Sachs cease making untrue and defamatory statements concerning Cornwell; (3) clarifies that Sachs has no right to use Cornwell's name in connection with the promotion of his book; and (4) warns Sachs that Cornwell will take "all steps necessary to protect her rights." Compl. Ex. 11, Letter from Rudell to Sachs, January 24, 2000. The February 1, 2000 letter from Rudell first states (1) that Cornwell is aware that Sachs is defaming her via letters to persons connected with her; (2) repeats Cornwell's demand that Sachs stop defaming Cornwell and, further, act to withdraw the defamatory statements he had already made; and (3) "withdraw and destroy all copies of the book and advertising related to your book that implies such illicit copying occurred." Clearly, then, nothing in these two letters merits—or even remotely resembles—the description publicly attrib-

uted to them by Sachs, both on his website and in his press release.

Sachs also published on his website that *The Last Precinct* "has a similar plotline," although Sachs cannot possibly have knowledge of such because the book has not yet been written. And, in any event, the sole source for Sachs' conclusion (the thirty word summary in *Publishers Weekly* ) simply does not support the conclusion that the plotlines are similar. To the contrary, read as a whole, the back page of Sachs' book (Hr'g Ex. 27) describes a radically different plotline from that discernable in the description in *Publisher's Weekly*. At the hearing, Sachs admitted that, even now, he had only suspicions that the plot of Cornwell's book was based on his. That, however, is not what he said in his advertising campaign. He said the similarity was factual. That is both false and misleading. Sachs suggests that Cornwell has made "strange and bizarre threats to try to keep the public from knowing about the similarity between her book and" his. In fact, the only threats are those fabricated by Sachs. Sachs also implies that he has knowledge that Cornwell concedes similarities between the books, and suggests that those similarities are damaging to her reputation. All of this is false and misleading.

Perhaps tellingly, Sachs' Memorandum in Opposition merely states the applicable law, then concludes tersely: "It is impossible to envision how she would expect to succeed on this claim." This is no answer whatsoever; moreover, it flatly contradicts representations made by Sachs himself, because he wrote that he estimated "the losses to [Cornwell] and Putnam could total in the millions . . . ." Compl. Ex. 8.

In brief, the public is likely to be deceived by Sachs' characterization of the letters as a "scandal" involving Cornwell, which Sachs clearly manufactured in an attempt to publicize his own, less-popular work. As Cornwell correctly asserts, Sachs' statements are more than false and misleading; they are vulgar and driven by malice. A reader of Sachs' website would be led to believe that Sachs made innocent inquiries of Cornwell's agents, only to be met with vicious, monstrous, and even criminal (*e.g.*, Cornwell's "conspiracy") responses by Cornwell. It is, indeed, no understatement to say that virtually all of Sachs' advertising which mentions Cornwell, whether on the website, the press release, or the sticker, is false and misleading. Accordingly, Cornwell is likely to succeed on the merits of her suit for a preliminary injunction for Sachs' violation of the Lanham Act.

**2. The Claim Under** Virginia Code **§ 8.01–40 (Count II)**

Virginia Code § 8.01–40 provides that:

Any person whose name, portrait, or picture is used without having first obtained the written consent of such person . . . for advertising purposes or for the purposes of trade, such persons may maintain a suit in equity against the person, firm, or corporation so using such person's name, portrait, or picture to prevent and restrain the use thereof . . . .

Cornwell is likely to succeed on the merits of her claim that Sachs violated Virginia Code § 8.01–40.

In correspondence with Cornwell's agents, Sachs made clear his intention to use Cornwell's name on the cover of a reprint of his novel. *See* Compl. Ex. 8, Memorandum of Sachs ("It seems the best and equitable thing is to put her name right at the top of the cover of my book.") In prominent language, the jacket cover he proposed to use read:

The MUST–READ gothic mystery

that proceeded

PATRICIA CORNWELL'S

newest bestseller:

*See* Compl. Ex. 10. Sachs did not use that jacket cover. Instead, he affixed to recent reprints of his book a sticker which reads "The book that famous PATRICIA

CORNWELL threatened to destroy!," and which directs readers to Sachs' website to learn more about the "scandal." He thus is now using Cornwell's name for the purpose of advertising his own book. By letters dated January 24, 2000, and February 1, 2000, however, Cornwell's counsel had made clear that Sachs did not have Cornwell's consent for the usage of her name.

 Non-consensual use of Cornwell's name for purposes of advertising Sachs' book constitutes a clear violation of Virginia Code § 8.01–40. Sachs only defense is that an exception to the Virginia law for "newsworthy events" permits his use of Cornwell's name to advertise his book, even though he admittedly was denied permission to use it. The exception is found in New York law,[6] and provides:

> Courts have applied the public interest exception to permit the use of photographs of persons without their consent where the photographs relate to a magazine, newspaper article or film concerning newsworthy events or subjects of public interest, including political events, social trends, scientific news, and stories of consumer interest.

*New York Magazine v. Metropolitan Transit Authority*, 987 F.Supp. 254 (S.D.N.Y.1997). Relying on this exception, Sachs argues that because Cornwell is (1) a public figure, and because (2) Sachs himself has alleged plagiarism (which, of course, cannot be, since Cornwell's book has yet to be published), he enjoys immunity from Cornwell's suit to the extent it seeks relief under § 8.01–40.

Sachs' attempt to convert the public interest/newsworthiness exception into a shield for his shameless violation of Virginia's privacy statute is completely lacking in merit. It is plainly frivolous and fanciful for Sachs to equate the sticker affixed to the cover of his book—or, for that matter, the cover itself—to the types of media entities which have successfully shielded

their activities from scrutiny under New York's privacy laws. *See, e.g., New York Magazine v. Metropolitan Transit Authority,* 987 F.Supp. 254 (S.D.N.Y.1997) (holding advertising in weekly magazine, stating "Possibly the only good thing in New York Rudy hasn't taken credit for," within newsworthiness exception); *Howell v. New York Post Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993) (rejecting Section 51 claim where photo of a patient at a psychiatric hospital was printed in newspaper story concerning another patient at same hospital); *Murray v. New York Magazine Co.,* 27 N.Y.2d 406, 318 N.Y.S.2d 474, 267 N.E.2d 256 (1971) (rejecting Section 51 claim where photo of plaintiff at St. Patrick's Day Parade was published on cover of magazine containing article on Irish immigrants).

 Perhaps more to the point, in Virginia there is no constitutional protection available for even a truthful use of a celebrity's name for the purpose of advertising a product. For example, in *Town & Country Properties v. Riggins,* 249 Va. 387, 457 S.E.2d 356 (1995), the Supreme Court of Virginia rejected the contention that the fame of ex-NFL running back John Riggins left him without statutory protection from the efforts of a real estate firm to prostitute his name in connection with an advertisement of a home Riggins had once occupied. After concluding that the use of Riggins' name was designed "to enhance the probability of ultimate sale of the property," see *id.* at 396–97, 457 S.E.2d 356, the Court stated:

> [D]efendant's constitutional argument does not require use to diminish the statutory privacy protection against exploitation of plaintiff's name. Ordinary citizens are entitled to the protective mantle of Virginia statute, and persons in a celebrity status should receive no less coverage in this respect.

---

**6.** New York's statutory privacy law is "substantially similar to" Virginia's, and therefore at least one Virginia court has looked to New York law for guidance. *See Town and Country Properties, Inc. v. Riggins,* 249 Va. 387, 457 S.E.2d 356 (1995).

Consequently, we hold that Code § 8.01–40(A), as applied to the facts of this case, is not constitutionally invalid under either the free speech provisions of the First Amendment to the federal constitution or the applicable provisions of the state constitution.

*Id.* at 396, 457 S.E.2d 356 (internal citations omitted). Because Sachs' use of Cornwell's name is, by Sachs' own admission, motivated by his desire to increase sales of his own book, *Riggins* is directly on point in all but one respect: there, the use of the Riggins' name, though held unlawful, was made in the context of a truthful representation (that Riggins had, in fact, lived in the house, as advertised); here, to the contrary, Sachs borrows Cornwell's name for false and deceptive purposes. Thus, as Cornwell correctly argues, if Virginia Code § 8.01–40 prohibits Sachs' truthful and accurate use of Cornwell's name, it must necessarily prohibit Sachs' false and deceptive use of Cornwell's name.

Also on point is the case of *Beverley v. Choices Women's Medical Center, Inc.,* 78 N.Y.2d 745, 579 N.Y.S.2d 637, 587 N.E.2d 275 (1991), in which the Court of Appeals of New York addressed a defendant's unauthorized use of plaintiff's picture in a promotional calendar. Defendant argued that the theme of its calendar—the history of the women's movement—was a message of public interest, and therefore was entitled to First Amendment protection. The court rejected this argument, holding that:

[A]lthough women's rights and a host of other worthy causes of movements are surely matters of important public interest, a commercial advertiser such as [defendant] *may not unilaterally neutralize or override the longstanding and significant statutory privacy protection by wrapping its advertising message in the cloak of public interest,* however commendable the educational and informational value.

*Id.* at 279 (emphasis added). Sachs seeks to wrap his advertising message in similar clothing, but, as in *Beverly,* he cannot thereby secure protection.

Finally, it is clear under New York law (which Sachs urges the Court to apply) that while the "factual reporting of newsworthy persons and events is in the public interest and is protected," the "fictitious is not." *Spahn v. Julian Messner, Inc.,* 18 N.Y.2d 324, 274 N.Y.S.2d 877, 221 N.E.2d 543, 545 (1966). Thus, even were Sachs truly engaged in reporting news (which he was not—he was engaged in promoting his book), the fictitious "scandal" that Sachs created out of whole cloth to promote his book does not entitle him to protection under the First Amendment.

In summary, it would pervert the public interest/ newsworthiness exception to apply it so as to protect the publication of a "scandal" which was wholly fabricated by the Defendant. In fact, there appears to be little "newsworthy" about the so-called "scandal," nor, if there were, would Sachs' mention of it on the cover of the reprint of his book be responsive to any public interest. Sachs' mention of Cornwell was clearly intended to foster interest in his own book, and thereby to increase sales. Accordingly, Cornwell is virtually certain to prevail on the merits of her claim that Sachs violated Virginia Code § 8.01–40.

Thus, on the claims in Counts II and III, analyzed under the test of likelihood of success necessary to support a mandatory preliminary injunction, Cornwell has met her burden on the likelihood of success component. Indeed, the Court has no real doubt about Cornwell's success on either count. It is, perhaps, possible that discovery will change the landscape for these claims; however, nothing yet offered by Sachs remotely resembles a defense to Count II or III except his effort to protect his unlawful conduct by reliance on the First Amendment. It is Sachs' responsibility to identify issues or defenses that could reasonably cast doubt on Cornwell's strong demonstration of a successful outcome on Counts II and III. He has not done so.

And, as explained, his First Amendment defense is supported neither in law nor in fact. What has happened here is that Sachs, whose own book had sold less than 2,000 copies, fabricated out of whole cloth a scenario which he thought to be sufficiently scandalous, which if spread abroad, would stimulate sales of his book. He then used that fictional creation—which, if believed, is potentially ruinous (as Sachs admits) of Cornwell's reputation—to promote his own book. When his hand was called, he sought to describe his self-admitted, highly damaging, marketing scheme as commentary protected by the First Amendment. If the First Amendment can be thusly abused, no public figure can ever be safe from damage to his or her reputation caused by unscrupulous profiteers who endeavor to enhance their own financial success by spreading false and misleading statements about the public figure. Nor could they be protected against the nonconsensual use of their names for advertising the works of others.

## D. The Public Interest Weighs In Favor Of Granting The Preliminary Injunction

Under *Direx Israel*, the final step in assessing the appropriateness of granting injunctive relief is to consider the public interest. In this case, the public interest unquestionably weighs in favor of granting the requested injunctive relief. This is so because, as appears from the record, Sachs has orchestrated a scandal for the sole purpose of promoting his own book. Moreover, he has done so by way of allegations of plagiarism which are themselves a logical impossibility and are based only on his suspicions. That the public has an interest in restricting the forms of abuse visited upon Cornwell is clear from the statutes under which Cornwell sues. Indeed, although the public has an interest in knowing about public figures, the public has an even greater interest in restraining the type of activity engaged in by Sachs. Hence, this factor too weighs in favor of granting the requested injunctive relief.

## CONCLUSION

All factors warrant an injunction here. An injunction of any sort must be tailored to fit the facts of the particular case and must be only so broad as to achieve the results permitted by the record. Here that means that Sachs must be (1) enjoined from further using the stickers; (2) required to tell booksellers to remove them or render them entirely unreadable; (3) required to amend his website; and (4) enjoined from using his press release or from otherwise disseminating false and misleading advertising and from using Cornwell's name to advertise his book. A bond of $50,000 is sufficient to satisfy Fed. R.Civ.P. 65(c).

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record by facsimile and regular mail.

It is so ORDERED.